UNITED PRESBYTERIAN CHURCH IN THE U.S.A., et al., Appellants,

v.

Ronald Wilson REAGAN, President of the United States, et al.

No. 83–1012.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 30, 1983.

Decided July 17, 1984.

William H. Schaap, Washington, D.C., and Frank Edmund Deale, New York City, with whom Michael D. Ratner, New York City, and Morton Stavis, Hoboken, N.J., were on the brief, for appellants.

Daniel J. Anderson, Atty., Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Stanley S. Harris, U.S. Atty., Washington, D.C. (at the time the brief was filed), and Vincent M. Garvey, Washington, D.C., were on the brief, for appellees.

Daniel J. Popeo, Paul D. Kamenar and Nicholas E. Calio, Washington, D.C., were on the brief for Senators Jeremiah Denton and Jesse Helms, Congressmen Richard Cheney, Larry McDonald and Jack Fields, former Congressman Jim Jeffries, and the Washington Legal Foundation, amici curiae, urging affirmance.

Before BORK and SCALIA, Circuit Judges, and WILLIAMS,* Senior District Judge for the Central District of California.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

This suit against the President of the United States and the heads of various departments and agencies responsible for the conduct of intelligence and counterintelligence activities challenges the legality of Executive Order No. 12333, entitled "United States Intelligence Activities." The plaintiffs, appellants here, are political and religious organizations, private individuals assertedly active in political, religious, academic or journalistic affairs, and a Member of Congress. They appeal from dismissal of the suit for lack of standing and, in the case of the Member of Congress, on the ground of equitable discretion.

I

On December 4, 1981, President Reagan issued Executive Order No. 12333, 3 C.F.R. 200 (1982), *reprinted in* 50 U.S.C. § 401 note (Supp. V 1981). That is the most recent in a series of executive orders, dating back to the Ford Administration, designed to specify the organization, procedures and limitations applicable to the foreign intelligence and counterintelligence activities of the Executive Branch. Parts 2 and 3 of the order, dealing with intelligence collection procedures and limitations, are set forth as an appendix to this opinion.

Appellants seek to challenge the legality of a number of features of the order, some of which are new but most of which are carried forward from the prior order on the same subject, Executive Order No. 12036, 3 C.F.R. 112 (1979), *reprinted in* 50 U.S.C. § 401 note (Supp. III 1979). The order prescribes that nothing it contains "shall be construed to authorize any activity in violation of the Constitution or statutes of the United States," § 2.8, 3 C.F.R. at 213

(1982), and requires agency heads to "[r]eport to the Attorney General possible violations of federal criminal laws by employees," § 1.7(a), 3 C.F.R. at 204 (1982), and to "[r]eport to the Intelligence Oversight Board ... concerning any intelligence activities of their organizations that they have reason to believe may be unlawful," § 1.7(d), 3 C.F.R. at 205 (1982). Appellants' complaint asserts, however, that the entire order violates the principle of separation of powers because it was promulgated without congressional authorization; and that various provisions on their face violate the National Security Act of 1947, 50 U.S.C. § 403(d)(3) (1976), the First Amendment's guarantees of freedom of speech, political belief, association and religion and of nonestablishment of religion, the Fourth Amendment's guarantee against unreasonable searches and seizures, and the Fifth Amendment's guarantee of the right to travel. They request a declaratory judgment declaring the order to be unconstitutional, and an injunction and order of mandamus restraining the defendants from enforcing its provisions.

The district court dismissed the claims of all plaintiffs except Ronald V. Dellums for lack of standing, because "viewed as a whole the complaint fails to allege that any plaintiff has suffered any injury in fact under the Order." *United Presbyterian Church v. Reagan,* 557 F.Supp. 61, 63 (D.D.C.1982). It dismissed the claim of Ronald V. Dellums, a Member of Congress, under the doctrine of "equitable discretion." *Id.* at 64–65. Appellants all claim that two kinds of injury which they alleged supported standing: (1) the "chilling" of constitutionally protected activities which they may refrain from pursuing out of fear that such activities would cause them to be targeted for surveillance under the order; and (2) the immediate threat of being targeted for surveillance, and being thereby deprived of legal rights, especially those under the First, Fourth, and Fifth Amendments. In addition, Representative Dellums claims that he alleged special injury

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

as a legislator, and that as to him the complaint was wrongfully dismissed under the doctrine of equitable discretion. Finally, all appellants claim that the district court abused its discretion in refusing to allow discovery that would have permitted them to allege more specific injuries.

## II

■ We find all of the appellants' alleged grievances insufficient to satisfy the injury-in-fact standing requirement imposed by Article III of the Constitution. "[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.' " *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982), *quoting Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). The injury or threat must be "distinct and palpable," *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), "concrete," *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 221, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974), " 'direct,' " *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974), *quoting Massachusetts v. Mellon,* 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923), and "both 'real and immediate,' not 'conjectural' or 'hypothetical,' " *id., quoting Golden v. Zwickler,* 394 U.S. 103, 109–10, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969), and *United Public Workers v. Mitchell,* 330 U.S. 75, 90, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947).

■ The injuries alleged by these appellants do not meet these requirements. The first kind of harm alleged, the "chilling effect" which is produced by their fear of being subjected to illegal surveillance and which deters them from conducting constitutionally protected activities, is foreclosed as a basis for standing by the Supreme Court's holding in *Laird v. Tatum,* 408

U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). There the plaintiffs alleged that a program of intelligence gathering conducted by the Army chilled the exercise of their First Amendment rights of speech and assembly. The Court declined to entertain the suit, holding that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." 408 U.S. at 13–14, 92 S.Ct. at 2325–2326. The Court distinguished its recognition of "chilling effect" in earlier decisions as follows:

[I]n each of these cases, the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging.

*Id.* at 11, 92 S.Ct. at 2324. That is of course not the case here. Executive Order No. 12333 issues no commands or prohibitions to these plaintiffs, and sets forth no standards governing their conduct.

All of the Supreme Court cases employing the concept of "chilling effect" involve situations in which the plaintiff has unquestionably suffered some concrete harm (past or immediately threatened) apart from the "chill" itself. For example, he has been denied admission to the bar, *Baird v. State Bar of Arizona,* 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971), or discharged from state employment, *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), or denied the delivery of mail, *Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), or required to take an oath on pain of dismissal from state employment, *Baggett v. Bullitt,* 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). "Chilling effect" is cited as the *reason* why the governmental imposition is invalid rather than as the *harm* which entitles the plaintiff to challenge it. In fact, some who have successfully challenged governmental action on "chilling effect" grounds have themselves demonstrably *not* suffered the harm of any chill, since they went ahead

and violated the governmental proscription anyway. *See, e.g., Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), where a state statute against use of "opprobrious words or abusive language" (which the Supreme Court struck down because of its chilling effect) had been so unsuccessful in chilling the defendant that he had said (and to a police officer, at that) "You son of a bitch, I'll choke you to death." *Id.* at 520 n. 1, 92 S.Ct. at 1105 n. 1. The courts do not typically inquire into the very first element that would have to be established in order to demonstrate the genuine harm of "chilling effect": the plaintiff's awareness of the existence of the governmental proscription. And with good reason, because to require that the harm of "chilling effect" actually be suffered by the plaintiff would destroy the whole purpose of the concept, which is to enable even those who have not been chilled to vindicate the First Amendment interests of those who have. It is only in this latter respect that "chilling effect" has anything to do with the doctrine of standing: It permits a person, who has standing to challenge governmental action because of the concrete harm it causes him, to assert a deficiency which may not affect him but only others. *See* L. TRIBE, AMERICAN CONSTITUTIONAL LAW § 12–29 (1978). It is, in short, the rationale for the First Amendment doctrine of overbreadth.[1]

Appellants seek to distinguish *Tatum* because there the plaintiffs' fears were caused by otherwise lawful surveillance, whereas their own fears arise out of an order which they claim authorizes surveillance illegal for other reasons as well. That distinction might be relevant to the merits question of whether the harm consisting of the fear is remediable. But it has nothing to do with the standing question of whether the fear *constitutes* cognizable harm. On the latter point, *Tatum* is clear and categorical: "[a]llegations of a subjective 'chill' are not ... adequate." 408 U.S. at 13–14, 92 S.Ct. at 2325–2326. *Cf. Allen v. Wright,* ——— U.S. ———, ———, 104 S.Ct. 3315, 3326, 82 L.Ed.2d 556 (1984) (reaching similar conclusion re: stigmatizing effect of governmental action). Appellants point to *National Student Association v. Hershey,* 412 F.2d 1103 (D.C.Cir. 1969), as an instance where this court afforded relief for claims based on the chilling effect of executive action. There a group of college student-body presidents and student organizations challenged a directive which instructed draft boards to reexamine the classifications of those who engaged in illegal demonstrations against the war in Vietnam, thus making them eligible to lose their draft deferments and in some cases to be immediately inducted into the armed forces. While acknowledging that "every plaintiff who alleges a First Amendment chilling effect and shivers in court has [not] thereby established a case or controversy," *id.* at 1114, we found that the plaintiffs had standing. *Hershey* was decided before the Supreme Court's opinion in *Tatum;* even so, its outcome does not contradict the reasoning of that case. The plaintiffs in *Hershey* were subject to the direct regulation of draft registration and induction, and their complaint was that that regulation was being administered in such fashion as unduly to impede their exercise of First Amendment rights. If *Hershey* establishes any principle beyond those described in *Tatum,* it is only that we will take a more generous view of what it means to be "prospectively subject" to a compulsion (in that case, induction into the military) where judicial review of the compulsion itself is precluded by statute.

---

1. Ordinarily ... challengers to a law are not permitted to raise the rights of third parties and can only assert their own interests. In overbreadth analysis, those rules give way: challengers *are* permitted to raise the rights of third parties; and the court invalidates the entire statute, "on its face," not merely "as applied," so that the overbroad law becomes unenforceable until a properly authorized court construes it more narrowly. The factor that motivates courts to depart from the normal adjudicatory rules is the concern with the "chilling," deterrent effect of the overbroad statute on third parties not courageous enough to bring suit.

G. GUNTHER, CASES AND MATERIALS ON CONSTITUTIONAL LAW 1186–87 (10th ed. 1980) (footnotes omitted).

*National Student Association v. Hershey, supra,* 412 F.2d at 1119. By contrast here, as in *Tatum,* no part of the challenged scheme imposes or even relates to any direct governmental constraint upon the plaintiffs, and there is no reason why they would be unable to challenge any illegal surveillance of them when (and if) it occurs.

The harm of "chilling effect" is to be distinguished from the immediate threat of concrete, harmful action. The former consists of present deterrence from First Amendment conduct because of the difficulty of determining the application of a regulatory provision to that conduct, and will not by itself support standing. The latter—imminence of concrete, harmful action such as threatened arrest for specifically contemplated First Amendment activity—does support standing. For example, if a pamphleteer is threatened with arrest for continued distribution of handbills, he has immediate recourse to the courts. *See Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). The problem with appellants' attempt to rely upon this sort of harm to establish standing in the present case is that they have not adequately averred that any specific action is threatened or even contemplated against them. They claim that they are more likely than the populace at large to be subjected to the unlawful activities which the order allegedly permits because (1) they have been subjected to unlawful surveillance in the past and (2) their activities are such that they are especially likely to be targets of the unlawful activities authorized by the order. (As to the latter point they urge, for example, that their activities involve considerable foreign travel and contact with foreigners, so that they are particularly susceptible to the finding that "there is probable cause to believe that [they are] ... an agent of a foreign power," which finding permits some of the intelligence and counterintelligence activities they claim to be unlawful, Executive Order No. 12333, § 2.5, 3 C.F.R. at 212 (1982).) Even if it were conceded that these factors place the plaintiffs at greater risk than the public at large, that would still fall far short of the "genuine threat" required to support this theory of standing, *Steffel v. Thompson, supra,* 415 U.S. at 475, 94 S.Ct. at 1223, as opposed to mere "speculative" harm, *id.* at 459, 94 S.Ct. at 1215. It must be borne in mind that this order does not *direct* intelligence-gathering activities against all persons who could conceivably come within its scope, but merely *authorizes* them. To give these plaintiffs standing on the basis of threatened injury would be to acknowledge, for example, that all churches would have standing to challenge a statute which provides that search warrants may be sought for church property if there is reason to believe that felons have taken refuge there. That is not the law.

The third kind of harm appellants allege is that some of them have been or are currently subjected to unlawful surveillance. Most, if not all, of the allegations on that score are in any event too generalized and nonspecific to support a complaint.[2] Even if they were more particularized, however, they could not support *this* complaint, which seeks declaratory, mandamus and injunctive relief with regard to Executive Order No. 12333. There is no allegation or even suggestion that any unlawful action to which the appellants have been subjected in the past was the conse-

---

2. For example, appellant Episcopal Churchmen of South Africa alleges that it "has been informed on numerous occasions of instances of mail sent by it which does not reach its destination, and of mail sent to it which was never received," Complaint, ¶ 41, *United Presbyterian Church v. Reagan,* No. 82–1824 (D.D.C. filed June 30, 1982); appellant Institute for Independent Social Journalism, Inc., alleges that it "has reason to believe that, for a long time, its officers, employees, and persons associated with it have been subjected to government surveillance, infiltration and disruption," *id.* at ¶ 53; and appellant All-African Peoples Revolutionary Party alleges that it "discerns a long-term pattern of surveillance of its members, disruption of their speaking engagements in this country, and attempts at character assassination of plaintiff's Central Committee members, and its organizer, Kwame Toure, formerly known as Stokley Carmichael," *id.* at ¶ 57.

quence of the presidential action they seek to challenge here.[3] Without such connection, standing to pursue the present suit does not exist. As the district court accurately described the matter, "[p]laintiffs appear to be seeking a judicial determination of the constitutionality of the entire national intelligence-gathering system." *United Presbyterian Church, supra,* 557 F.Supp. at 62. The fact that they were harmed by some actions taken within that system in the past does not support such a generalized challenge.

With regard to all the asserted bases for standing discussed above, this suit is a needless replay of *Halkin v. Helms,* 690 F.2d 977 (D.C.Cir.1982), which included a similar challenge to this same executive order,[4] and whose plaintiffs included one of the present appellants (Sidney Peck). The harms alleged there included all three of the sorts discussed above. We find once again that they constitute "nothing more than a 'generalized grievance' against the intelligence-gathering methods sanctioned by the President." *Id.* at 1001–02, *quoting Flast v. Cohen,* 392 U.S. 83, 106, 88 S.Ct. 1942, 1955, 20 L.Ed.2d 947 (1968).

### III

We turn next to the distinctive type of harm alleged only by Representative Ronald V. Dellums. He asserts that the Executive Order confers authority on the intelligence agencies beyond that authorized by Congress, and indeed that the order violates express limitations imposed by Congress. Therefore, appellant Dellums claims that his powers as a legislator have been diminished, constituting sufficient injury to give him standing.

■ The district court did not reach this issue. Perceiving that "traditional standing doctrine [was] an approach that has apparently fallen into disfavor in this Circuit so far as suits by federal legislators are concerned," *United Presbyterian Church, supra,* 557 F.Supp. at 64, it dismissed Dellums' suit under the doctrine of "equitable discretion" described and applied by a panel of this court in *Riegle v. Federal Open Market Committee,* 656 F.2d 873 (D.C.Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981). *United Presbyterian Church, supra,* 557 F.Supp. at 64–65. Subsequent panel opinions that adopt the *Riegle* rationale, however—opinions issued after the district court's opinion here—make clear that their substitution of equitable discretion for the doctrine of standing is not complete.[5] *See American Federation of Government Employees v. Pierce,* 697 F.2d 303 (D.C. Cir.1982); *Moore v. United States House of Representatives,* 733 F.2d 946 (D.C.Cir. 1984). They continue to invoke standing to bar suit unless the Member of Congress's alleged injury is "specific and cognizable," arising out of an interest "positively identified by the Constitution." *Moore, supra,* 733 F.2d at 951. Standing does not exist,

---

**3.** In fact, since many of the appellants allege unlawful activities directed against them before this executive order or either of its predecessors existed, their allegations tend if anything to undermine the notion of a causal link. One of the original purposes of issuing an executive order on this subject was to eliminate abuses in intelligence and counterintelligence activities that had previously occurred and that had been brought to public attention by the *Report to the President by the Commission on CIA Activities Within the United States* (1975) and the *Final Report of the Select Committee to Study Governmental Operations with Respect to Intelligence Activities,* S.Rep. No. 755, 94th Cong., 2d Sess. (1976). *See* President's News Conference, 12 WEEKLY COMP. PRES.DOC. 227 (Feb. 17, 1976); President's Message to Congress Proposing Legislative Reforms, 12 WEEKLY COMP.PRES.DOC. 243 (Feb. 18, 1976).

**4.** The plaintiffs in *Halkin* originally challenged intelligence-gathering activities under Executive Order No. 12036, but by the time the case was decided that had been replaced with Executive Order No. 12333. The court therefore treated the allegations as a challenge to Executive Order No. 12333 in order to avoid mooting them. *Halkin v. Helms, supra,* 690 F.2d at 1001 & n. 87.

**5.** The subsequent opinions have also changed the name of the new doctrine from "circumscribed equitable discretion," which it was at the time the district court's opinion was written, to "remedial discretion." *Vander Jagt v. O'Neill,* 699 F.2d 1166, 1172 (D.C.Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983).

and the opportunity to exercise remedial discretion is not presented, where the legislator's grievance consists of "generalized, amorphous injuries due to ... the conduct of the Executive," *id.*, or "a generalized complaint that [his] effectiveness is diminished by allegedly illegal activities taking place outside the legislative forum," *id.* Cited as one of the specific examples of the latter was *Harrington v. Bush*, 553 F.2d 190 (D.C.Cir.1977), in which "a member of the House ... claimed that certain activities of the Central Intelligence Agency were illegal, and that such unlawful conduct diminished his effectiveness as a legislator," *Moore, supra,* 733 F.2d at 951. Representative Dellums' suit is indistinguishable. The fact that the allegedly illegal activities are authorized by the President rather than the Director of Central Intelligence cannot alter the conclusion that his complaint is "a generalized grievance about the conduct of government, not a claim founded on injury to the legislator by distortion of the process by which a bill becomes law." *Id.* at 952.

■ It seems to us inconvenient for our district judges to have to distinguish between those legislator claims that lack standing, and those that should be denied a favorable exercise of remedial discretion for reasons generally indistinguishable from those that underlie the doctrine of standing. It is, moreover, an unproductive inconvenience, in light of the fact that we have only once permitted the exercise of remedial (or equitable) discretion to entertain rather than dismiss a suit brought by a congressional plaintiff—and that in a case where it made no difference to the result. *See id.* at 961 n. 7 (Scalia, J., concurring), *citing American Federation of Government Employees v. Pierce, supra.* However, even under the *Riegle-Moore* departure from traditional standing doctrine, this case would fall within what remnant of standing doctrine endures. We affirm the district court's dismissal of Representative Dellums' claims on the ground that the reasons it gave for declining to exercise remedial discretion demonstrate a lack of standing.

## IV

Appellants' final contention regards the district court's denial of their discovery requests. Shortly after filing their complaint, and before respondents moved to dismiss, appellants noticed the deposition of FBI Director William Webster and filed a motion for production of documents. The requested "[a]ll documents which reveal ... the names of plaintiff[s] ... that will be or have been targeted as 'agents of foreign powers' or as 'sources of foreign counterintelligence information' under Executive Order 12333," "[a]ll documents which set forth the criteria for targeting [those who were targeted] and all the documents which were generated in targeting [them]," "[a]ll documents which describe the manner in which the Federal Bureau of Investigation and the Central Intelligence Agency will carry out their responsibilities under Executive Order 12333," and "[a]ll 'Guidelines' which describe the manner in which Executive Order 12333 is to be implemented." Motion for Production of Documents, ¶¶ 1–4, *United Presbyterian Church v. Reagan*, No. 82–1824 (D.D.C. filed Aug. 13, 1982). The district court ordered that no discovery proceed without its prior approval (D.D.C. Sept. 13, 1982 (Order)), and subsequently denied the appellants' motion to compel production of documents (D.D.C. Oct. 7, 1982 (Order)). Plaintiffs claim that this was error.

■ Trial courts enjoy wide discretion in handling pretrial discovery matters. *In re Multi-Piece Rim Products Liability Litigation*, 653 F.2d 671, 679 (D.C.Cir.1981). Their discovery rulings are reversed only on a clear showing of abuse, and "it is unusual to find abuse of discretion in these matters." *Swanner v. United States*, 406 F.2d 716, 719 (5th Cir.1969). We find no abuse here.

■ While in some cases where the court's jurisdiction is challenged, limited discovery may be warranted to explore jurisdictional facts, *see* 4A J. MOORE, J. LUCAS & D. EPSTEIN, MOORE'S FEDERAL PRACTICE

¶ 30.53[5] (2d ed. 1983), the district court was reasonable in concluding that this was not such a case. The burden is on the plaintiff to allege facts sufficient to support standing. *Warth v. Seldin, supra,* 422 U.S. at 501–02, 95 S.Ct. at 2206–07. Where, as here, the plaintiff does not even on information and belief assert specific facts sufficient to confer standing, the district court may properly deny requests for discovery. *See McLaughlin v. McPhail,* 707 F.2d 800, 806 (4th Cir.1983). That is particularly so where the request is, as the district court accurately described it here, "a 'fishing expedition' of the most obvious kind, ... undertake[n] ... in the hope that some cause of action might be uncovered." *United Presbyterian Church, supra,* 557 F.Supp. at 64.

For the foregoing reasons, the district court's judgment is affirmed.

*So ordered.*

## APPENDIX

Executive Order No. 12333 of December 4, 1981, Parts 2 and 3, 3 C.F.R. 200, 210–16 (1982), *reprinted in* 50 U.S.C. § 401 note (Supp. V 1981).

**United States Intelligence Activities**

Part 2

*Conduct of Intelligence Activities*

2.1 *Need.* Accurate and timely information about the capabilities, intentions and activities of foreign powers, organizations, or persons and their agents is essential to informed decisionmaking in the areas of national defense and foreign relations. Collection of such information is a priority objective and will be pursued in a vigorous, innovative and responsible manner that is consistent with the Constitution and applicable law and respectful of the principles upon which the United States was founded.

2.2 *Purpose.* This Order is intended to enhance human and technical collection techniques, especially those undertaken abroad, and the acquisition of significant foreign intelligence, as well as the detec-tion and countering of international terrorist activities and espionage conducted by foreign powers. Set forth below are certain general principles that, in addition to and consistent with applicable laws, are intended to achieve the proper balance between the acquisition of essential information and protection of individual interests. Nothing in this Order shall be construed to apply to or interfere with any authorized civil or criminal law enforcement responsibility of any department or agency.

2.3 *Collection of Information.* Agencies within the Intelligence Community are authorized to collect, retain or disseminate information concerning United States persons only in accordance with procedures established by the head of the agency concerned and approved by the Attorney General, consistent with the authorities provided by Part 1 of this Order. Those procedures shall permit collection, retention and dissemination of the following types of information:

(a) Information that is publicly available or collected with the consent of the person concerned;

(b) Information constituting foreign intelligence or counterintellegence, including such information concerning corporations or other commercial organizations. Collection within the United States of foreign intelligence not otherwise obtainable shall be undertaken by the FBI or, when significant foreign intelligence is sought, by other authorized agencies of the Intelligence Community, provided that no foreign intelligence collection by such agencies may be undertaken for the purpose of acquiring information concerning the domestic activities of United States persons;

(c) Information obtained in the course of a lawful foreign intelligence, counterintelligence, international narcotics or international terrorism investigation;

(d) Information needed to protect the safety of any persons or organizations, including those who are targets, victims or hos-

tages of international terrorist organizations;

(e) Information needed to protect foreign intelligence or counterintelligence sources or methods from unauthorized disclosure. Collection within the United States shall be undertaken by the FBI except that other agencies of the Intelligence Community may also collect such information concerning present or former employees, present or former intelligence agency contractors or their present or former employees, or applicants for any such employment or contracting;

(f) Information concerning persons who are reasonably believed to be potential sources or contacts for the purpose of determining their suitability or credibility;

(g) Information arising out of a lawful personnel, physical or communications security investigation;

(h) Information acquired by overhead reconnaissance not directed at specific United States persons;

(i) Incidentally obtained information that may indicate involvement in activities that may violate federal, state, local or foreign laws; and

(j) Information necessary for administrative purposes.

In addition, agencies within the Intelligence Community may disseminate information, other than information derived from signals intelligence, to each appropriate agency within the Intelligence Community for purposes of allowing the recipient agency to determine whether the information is relevant to its responsibilities and can be retained by it.

2.4 *Collection Techniques.* Agencies within the Intelligence Community shall use the least intrusive collection techniques feasible within the United States or directed against United States persons abroad. Agencies are not authorized to use such techniques as electronic surveillance, unconsented physical search, mail surveillance, physical surveillance, or monitoring

devices unless they are in accordance with procedures established by the head of the agency concerned and approved by the Attorney General. Such procedures shall protect constitutional and other legal rights and limit use of such information to lawful governmental purposes. These procedures shall not authorize:

(a) The CIA to engage in electronic surveillance within the United States except for the purpose of training, testing, or conducting countermeasures to hostile electronic surveillance;

(b) Unconsented physical searches in the United States by agencies other than the FBI, except for:

(1) Searches by counterintelligence elements of the military services directed against military personnel within the United States or abroad for intelligence purposes, when authorized by a military commander empowered to approve physical searches for law enforcement purposes, based upon a finding of probable cause to believe that such persons are acting as agents of foreign powers; and

(2) Searches by CIA of personal property of non-United States persons lawfully in its possession.

(c) Physical surveillance of a United States person in the United States by agencies other than the FBI, except for:

(1) Physical surveillance of present or former employees, present or former intelligence agency contractors or their present or former employees, or applicants for any such employment or contracting; and

(2) Physical surveillance of a military person employed by a nonintelligence element of a military service.

(d) Physical surveillance of a United States person abroad to collect foreign intelligence, except to obtain significant information that cannot reasonably be acquired by other means.

2.5 *Attorney General Approval.* The Attorney General hereby is delegated the

power to approve the use for intelligence purposes, within the United States or against a United States person abroad, of any technique for which a warrant would be required if undertaken for law enforcement purposes, provided that such techniques shall not be undertaken unless the Attorney General has determined in each case that there is probable cause to believe that the technique is directed against a foreign power or an agent of a foreign power. Electronic surveillance, as defined in the Foreign Intelligence Surveillance Act of 1978, shall be conducted in accordance with that Act, as well as this Order.

2.6 *Assistance to Law Enforcement Authorities.* Agencies within the Intelligence Community are authorized to:

(a) Cooperate with appropriate law enforcement agencies for the purpose of protecting the employees, information, property and facilities of any agency within the Intelligence Community;

(b) Unless otherwise precluded by law or this Order, participate in law enforcement activities to investigate or prevent clandestine intelligence activities by foreign powers, or international terrorist or narcotics activities;

(c) Provide specialized equipment, technical knowledge, or assistance of expert personnel for use by any department or agency, or, when lives are endangered, to support local law enforcement agencies. Provision of assistance by expert personnel shall be approved in each case by the General Counsel of the providing agency; and

(d) Render any other assistance and cooperation to law enforcement authorities not precluded by applicable law.

2.7 *Contracting.* Agencies within the Intelligence Community are authorized to enter into contracts or arrangements for the provision of goods or services with private companies or institutions in the United States and need not reveal the sponsorship of such contracts or arrangements for authorized intelligence purposes. Contracts or arrangements with academic institutions may be undertaken only with the consent of appropriate officials of the institution.

2.8 *Consistency With Other Laws.* Nothing in this Order shall be construed to authorize any activity in violation of the Constitution or statutes of the United States.

2.9 *Undisclosed Participation in Organizations Within the United States.* No one acting on behalf of agencies within the Intelligence Community may join or otherwise participate in any organization in the United States on behalf of any agency within the Intelligence Community without disclosing his intelligence affiliation to appropriate officials of the organization, except in accordance with procedures established by the head of the agency concerned and approved by the Attorney General. Such participation shall be authorized only if it is essential to achieving lawful purposes as determined by the agency head or designee. No such participation may be undertaken for the purpose of influencing the activity of the organization or its members except in cases where:

(a) The participation is undertaken on behalf of the FBI in the course of a lawful investigation; or

(b) The organization concerned is composed primarily of individuals who are not United States persons and is reasonably believed to be acting on behalf of a foreign power.

2.10 *Human Experimentation.* No agency within the Intelligence Community shall sponsor, contract for or conduct research on human subjects except in accordance with guidelines issued by the Department of Health and Human Services. The subject's informed consent shall be documented as required by those guidelines.

2.11 *Prohibition on Assassination.* No person employed by or acting on behalf of the United States Government shall engage in, or conspire to engage in, assassination.

2.12 *Indirect Participation.* No agency of the Intelligence Community shall partici-

 pate in or request any person to undertake activities forbidden by this Order.

## Part 3

*General Provisions*

3.1 *Congressional Oversight.* The duties and responsibilities of the Director of Central Intelligence and the heads of other departments, agencies, and entities engaged in intelligence activities to cooperate with the Congress in the conduct of its responsibilities for oversight of intelligence activities shall be as provided in title 50, United States Code, section 413. The requirements of section 662 of the Foreign Assistance Act of 1961, as amended (22 U.S.C. 2422), and section 501 of the National Security Act of 1947, as amended (50 U.S.C. 413), shall apply to all special activities as defined in this Order.

3.2 *Implementation.* The NSC, the Secretary of Defense, the Attorney General, and the Director of Central Intelligence shall issue such appropriate directives and procedures as are necessary to implement this Order. Heads of agencies within the Intelligence Community shall issue appropriate supplementary directives and procedures consistent with this Order. The Attorney General shall provide a statement of reasons for not approving any procedures established by the head of an agency in the Intelligence Community other than the FBI. The National Security Council may establish procedures in instances where the agency head and the Attorney General are unable to reach agreement on other than constitutional or other legal grounds.

3.3 *Procedures.* Until the procedures required by this Order have been established, the activities herein authorized which require procedures shall be conducted in accordance with existing procedures or requirements established under Executive Order No. 12036. Procedures required by this Order shall be established as expeditiously as possible. All procedures promulgated pursuant to this Order shall be made available to the congressional intelligence committees.

3.4 *Definitions.* For the purpose of this Order, the following terms shall have these meanings:

(a) *Counterintelligence* means information gathered and activities conducted to protect against espionage, other intelligence activities, sabotage, or assassinations conducted for or on behalf of foreign powers, organizations or persons, or international terrorist activities, but not including personnel, physical, document or communications security programs.

(b) *Electronic surveillance* means acquisition of a nonpublic communication by electronic means without the consent of a person who is a party to an electronic communication or, in the case of a nonelectronic communication, without the consent of a person who is visably [*sic*] present at the place of communication, but not including the use of radio direction-finding equipment solely to determine the location of a transmitter.

(c) *Employee* means a person employed by, assigned to or acting for an agency within the Intelligence Community.

(d) *Foreign intelligence* means information relating to the capabilities, intentions and activities of foreign powers, organizations or persons, but not including counterintelligence except for information on international terrorist activities.

(e) *Intelligence activities* means all activities that agencies within the Intelligence Community are authorized to conduct pursuant to this Order.

(f) *Intelligence Community* and *agencies within the Intelligence Community* refer to the following agencies or organizations:

(1) The Central Intelligence Agency (CIA);

(2) The National Security Agency (NSA);

(3) The Defense Intelligence Agency (DIA);

(4) The offices within the Department of Defense for the collection of specialized

national foreign intelligence through reconnaissance programs;

(5) The Bureau of Intelligence and Research of the Department of State;

(6) The intelligence elements of the Army, Navy, Air Force, and Marine Corps, the Federal Bureau of Investigation (FBI), the Department of the Treasury, and the Department of Energy; and

(7) The staff elements of the Director of Central Intelligence.

(g) *The National Foreign Intelligence Program* includes the programs listed below, but its composition shall be subject to review by the National Security Council and modification by the President:

(1) The programs of the CIA;

(2) The Consolidated Cryptologic Program, the General Defense Intelligence Program, and the programs of the offices within the Department of Defense for the collection of specialized national foreign intelligence through reconnaissance, except such elements as the Director of Central Intelligence and the Secretary of Defense agree should be excluded;

(3) Other programs of agencies within the Intelligence Community designated jointly by the Director of Central Intelligence and the head of the department or by the President as national foreign intelligence or counterintelligence activities;

(4) Activities of the staff elements of the Director of Central Intelligence;

(5) Activities to acquire the intelligence required for the planning and conduct of tactical operations by the United States military forces are not included in the National Foreign Intelligence Program.

(h) *Special activities* means activities conducted in support of national foreign policy objectives abroad which are planned and executed so that the role of the United States Government is not apparent or acknowledged publicly, and functions in support of such activities, but which are not intended to influence United States political processes, public opinion, policies, or media and do not include diplomatic activities or the collection and production of intelligence or related support functions.

(i) *United States person* means a United States citizen, an alien known by the intelligence agency concerned to be a permanent resident alien, an unincorporated association substantially composed of United States citizens or permanent resident aliens, or a corporation incorporated in the United States, except for a corporation directed and controlled by a foreign government or governments.

3.5 *Purpose and Effect.* This Order is intended to control and provide direction and guidance to the Intelligence Community. Nothing contained herein or in any procedures promulgated hereunder is intended to confer any substantive or procedural right or privilege on any person or organization.

3.6 *Revocation.* Executive Order No. 12036 of January 24, 1978, as amended, entitled "United States Intelligence Activities," is revoked.

RONALD REAGAN

THE WHITE HOUSE,

*December 4, 1981.*

———

Editorial Note: The President's statement of Dec. 4, 1981, on United States intelligence activities is printed in the *Weekly Compilation of Presidential Documents* (vol. 17, p. 1335).