# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 4, 2008　　　　Decided February 20, 2009

No. 07-5080

SCOTT TOOLEY,
APPELLANT

v.

JANET NAPOLITANO, HOMELAND SECURITY SECRETARY, IN
HER OFFICIAL CAPACITY, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 06cv00306)

———

*Cassandra S. Bernstein*, appointed by the court, argued the cause for *amicus curiae* in support of appellant. With her on the briefs were *Richard P. Bress* and *Gabriel K. Bell*.

*Scott Tooley*, appearing pro se, was on the brief for appellant.

*Teal Luthy Miller*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Gregory G. Katsas*, Assistant Attorney General, and *Douglas*

*Letter*, Litigation Counsel. *Anthony A. Yang*, Attorney, entered an appearance.

Before: SENTELLE, *Chief Judge*, AND TATEL, *Circuit Judge*, AND WILLIAMS, *Senior Circuit Judge.*

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

Dissenting opinion filed by *Chief Judge* SENTELLE.

WILLIAMS, *Senior Circuit Judge*: According to Scott Tooley's complaint, he phoned Southwest Airlines in the spring of 2002 to buy tickets to fly to Nebraska to visit his family. At the end of the call, after Tooley had provided Southwest with his name and contact information, the airline representative asked Tooley if he had any "comments, questions, or suggestions." Compl. ¶ 18. Tooley responded that, in the wake of the September 11 attacks, Southwest should screen 100 percent of "everything," and that without "proper security" Tooley and other members of the traveling public were "less safe due to the potential that those who wish to harm American citizens could put a bomb on a plane." Compl. ¶¶ 19-20. The Southwest representative responded with alarm and declared "you said the 'b' word, you said the 'b' word." Tooley Aff. ¶ 7. Tooley attempted to explain to the representative that she had not understood him correctly, but she nevertheless placed him on hold. After 20 minutes, Tooley finally hung up. *Id*.

According to Tooley, the ticket agent's seeming paranoia was not the end of the matter. Other events followed, which he ascribes to various government officials; those remaining in the suit, after a partial dismissal by Tooley, are the United States Attorney General, the Secretary of the Department of Homeland Security, and the Administrator of the

Transportation Security Administration, all sued solely in their official capacities (collectively, the "government"). See *Tooley v. Bush*, No. 06-306, 2006 WL 3783142, at *1 (D.D.C. 2006) (detailing the defendants initially included in Tooley's complaint and his later dismissals).

Tooley claims that in the fall of 2003, more than a year after the call to Southwest, he began to notice problematic phone connections, including "telltale" intermittent clicking noises. Compl. ¶ 21. He alleges, "[u]pon information and belief," that his telephone problems were caused by illegal wiretaps placed on his residential landline phone, his landline phone at his former residence, his cellular phone, his wife's cellular phone, the phones of his father, brother, sister, and in-laws, and his family's phone in Lincoln, Nebraska, where relatives from "France made calls from France to the home, where Mr. Tooley was visiting his mother for the week." *Id*. ¶ 22. Tooley claims that these alleged wiretaps were placed in response to the comments he had made to Southwest's representative.

In addition, he alleges that the government has placed him on "one or more terrorist watch lists" and that as a result he is "being illegally monitored by Defendants." *Id*. ¶ 25. This illegal monitoring has allegedly taken various forms, including the placement of permanent "Radio Frequency Identification Tags" on Tooley's vehicle and improper detentions and searches at airports. *Id*. ¶¶ 23-24. Tooley also claims, in an affidavit submitted to the district court, that in March of 2005, when then-President George W. Bush visited Louisville, Kentucky, where Tooley currently resides, "an officer in a Ford Crown Victoria sat out in front of [Tooley's] home for approximately six (6) hours a day" during the week leading up to and the week of President Bush's visit. Tooley Aff. ¶ 19.

In order to obtain more information regarding this allegedly illegal surveillance, Tooley submitted several requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. See *Tooley*, 2006 WL 3783142, at *3-8 (detailing the various FOIA requests). After the requests failed to yield any information confirming his suspicions, Tooley filed the present case in the district court. Counts I and II charge Fourth Amendment and constitutional right to privacy violations, respectively; Count III claims a First Amendment violation on the theory that the government's illegal surveillance had caused him to curtail his speech. Count IV sought declaratory relief under FOIA.

The district court granted the government's motion for summary judgment on the FOIA count, *Tooley*, 2006 WL 3783142, at *21, and Tooley does not challenge that decision. As to Counts I through III, the government moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) on the ground that Tooley lacked Article III standing. The district court addressed the standing arguments by dividing Tooley's allegations into three categories based on the character of the government's alleged unlawful behavior—wiretapping; physical surveillance (including the claim that Defendants unlawfully placed a Radio Frequency Identification Tag on Tooley's vehicle); and the unlawful placement of Tooley's name on a terrorist watch list. *Tooley*, 2006 WL 3783142, at *22.

The court held that Tooley lacked Article III standing for both the wiretapping claims and physical surveillance claims. It reasoned that "it is altogether possible" that Tooley was the subject of "entirely lawful wiretaps placed by state or local law enforcement agencies" and that Tooley could not show that it was a federal agent responsible for any of his alleged physical surveillance. *Id*. at *23, 25.

As to Tooley's being placed on terrorist watch lists, the court found Article III standing, but nonetheless dismissed Tooley's claim on the basis of another subject matter jurisdiction problem. *Tooley*, 2006 WL 3783142, at *26. Focusing solely on the Transportation Security Administration ("TSA") watch lists, the court found, in reliance on 49 U.S.C. §§ 46110(a), (c), that such lists "are incorporated into Security Directives issued by TSA . . . and Congress has vested exclusive jurisdiction to review such directives in the Court of Appeals." *Id.*

Tooley now appeals the district court's dismissals of Counts I through III, arguing that the district court improperly applied the "liberal requirements of notice pleading" and rested its conclusions "on a basic misreading of the Complaint." Petr. Br. 2. Thin as Tooley's claims appear, we agree and therefore reverse and remand the case.

* * *

To establish constitutional standing a plaintiff must show an injury in fact that is fairly traceable to the challenged conduct and that will likely be redressed by a favorable decision on the merits. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The burden on the plaintiff to show each element grows increasingly stringent at each successive stage of the litigation. *Id*. at 561. At the pleading stage, Federal Rule of Civil Procedure 8(a) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," from which it follows that "general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan*, 504 U.S. at 561. At the summary judgment stage, by contrast, "the plaintiff can no longer rest on . . . mere allegations" but must set forth specific facts by affidavit or other evidence. *Id*. (internal quotations omitted).

In the absence of district court resolution of disputed issues of material fact, we review a dismissal for lack of standing de novo. *Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1105 (D.C. Cir. 2008).

The Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), has produced some uncertainty as to exactly what is required of a plaintiff at the pleading stage. See *Aktieselskabet Af 21. November 2001 v. Fame Jeans*, 525 F.3d 8, 15 & n.3 (D.C. Cir. 2008) (gathering cases suggesting that courts "have disagreed about the import of *Twombly*"). In *Fame Jeans*, however, we concluded that "*Twombly* leaves the longstanding fundamentals of notice pleading intact." *Id.* at 15. Thus, we "must assume all the allegations of the complaint are true . . . and . . . must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged." *Id.* at 17 (internal citations and quotations omitted). This liberal pleading standard requires a court to deny a motion to dismiss "even if it strikes a savvy judge that . . . recovery is very remote and unlikely." *Twombly*, 127 S. Ct. at 1965. So long as the pleadings suggest a "plausible" scenario to "sho[w] that the pleader is entitled to relief," a court may not dismiss. *Id.* at 1966.

In finding that Tooley lacked standing, the district court delved into an examination of the merits of Tooley's claim and found them wanting. For example, in evaluating Tooley's wiretapping claim, the district court surmised that "Plaintiff has been the subject of entirely lawful wiretaps placed by state or local law enforcement agencies." *Tooley*, 2006 WL 3783142, at *23. Injunctive relief, it reasoned, would be "ineffective if in fact, Plaintiff is the subject of wiretaps placed by someone other than federal officials or if there are actually no wiretaps." *Id.* at *24. Similarly, in evaluating Tooley's physical surveillance claims, the district court questioned whether the person Tooley alleged was sitting in

front of his house was a federal officer and whether the officer was there as a consequence of his phone conversation with Southwest. *Id.* at *23-24.

But at this stage of the litigation standing "in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). A plaintiff does not need to "*prove* that the agency action it attacks is unlawful"; otherwise "every unsuccessful plaintiff will have lacked standing in the first place." *Louisiana Energy & Power Auth. v. FERC*, 141 F.3d 364, 368 (D.C. Cir. 1998) (internal quotations omitted). Under our system's undemanding pleading rules, the district court was required to accept Tooley's factual allegations as true.

On appeal the government makes little attempt to defend the hypothetical scenarios that led the district court to conclude that Tooley's alleged injuries may not have been caused by the defendants. Instead, the government argues that, even accepting Tooley's factual allegations as true, they are "so insubstantial . . . that they fail to 'raise a right to relief above the speculative level.'" Appellees' Br. 30 (quoting *Twombly*, 127 S. Ct. at 1965).

Specifically, the government argues that Tooley's allegations are "no more substantial than the allegations this Court found inadequate to establish standing in *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984)." Appellees' Br. 34. In *United Presbyterian* the plaintiffs challenged an executive order governing foreign intelligence and counterintelligence activities. *United Presbyterian*, 738 F.2d at 1377. We affirmed the dismissal of the claims because the plaintiffs could not satisfy the injury-in-fact standing requirement. The plaintiffs had asserted that they were "currently subjected to unlawful surveillance" as

evidenced by factual allegations that one plaintiff suffered from interrupted mail service and another from disruption of speaking engagements; but we found that "[m]ost, if not all, of the allegations on that score are in any event too generalized and nonspecific to support a complaint." *Id.* at 1380.

While we share many of our dissenting colleague's concerns over the ultimate plausibility of Tooley's claims, his allegations are somewhat less generalized and self-contradictory than those of *United Presbyterian*. Especially when taken in combination, Tooley's claims—to have seen an officer sitting outside his home during a Presidential visit, to have heard supposed "telltale" phone clicks, and to be subject to searches every time he travels— create links to government surveillance that are more specific than the mere loss of mail. Further, although the temporal link between the precipitating event and the alleged surveillance may in Tooley's case appear stretched nearly to the breaking point, in *United Presbyterian* time would have had to run backwards: "[M]any of the appellants allege unlawful activities directed against them *before* this executive order or either of its predecessors existed." *Id.* at 1381 n.3 (emphasis added). Thus, we think the two cases are distinguishable and that Tooley's standing allegations meet the federal rules' notoriously loose pleading criteria.

As to Tooley's claim that the alleged surveillance "chilled" his speech in violation of the First Amendment, the government points to *Laird v. Tatum*, 408 U.S. 1 (1972). There the Supreme Court held that the plaintiffs had not adequately presented a justiciable controversy because their decision to curtail their speech was based on a "subjective 'chill,'" and not a claim of "specific present objective harm or a threat of specific future harm." *Id.* at 13-14. But in *Laird* the plaintiffs' alleged self-censorship was "caused, not by any

specific action of the Army against them, [but] only [by] the existence and operation of the intelligence gathering and distributing system." *Id.* at 3 (internal quotations omitted). Tooley, in contrast, alleges harm from specific events, arguably linked to government conduct, that he says caused the chilling effect. Whether or not Tooley's alleged harms amount to a First Amendment claim remains an open question, one which was not before the district court.

Finally, we turn to Tooley's claim that he has been wrongfully placed on terrorist watch lists. The Complaint alleges that following Tooley's conversation with Southwest in the spring of 2002, he has been "improperly detained and subjected to a strict search without any probable cause." Compl. ¶ 24. His affidavit provides further details about these detentions and searches, which he claims occurred every time he traveled before filing this suit. Tooley Aff. ¶ 15. Specifically, Tooley alleges that in July 2004, he was subjected to a "degrading and unreasonable search" at Omaha's Eppley Airfield. The district court concluded, and we affirm, that Tooley has established Article III standing on his watch list claims. *Tooley*, 2006 WL 3783142, at *26.

But the district court's conclusion that it lacked subject matter jurisdiction over the entirety of Tooley's watch list claims was based on a misreading of the complaint. When analyzing Tooley's claim that he was placed on "one or more terrorist watch lists," Compl. ¶ 25, the district court focused only on TSA watch lists. It concluded that TSA watch lists are incorporated into security directives issued by TSA pursuant to 49 U.S.C. § 114(*l*)(2)(A) and that therefore the

federal courts of appeals have exclusive jurisdiction over such watch lists pursuant to 49 U.S.C. §§ 46110(a), (c).[1]

We may assume for our purposes that the district court was correct insofar as TSA watch lists are concerned. But Tooley's complaint did not focus solely on watch lists maintained by the TSA. Though he mentions TSA watch lists numerous times in his pleadings, he also alleges that he has been placed on numerous watch lists and sought an injunction requiring "Defendants to remove his name from *any and all* watch lists that may indicate Plaintiff is associated with any terrorist activities or organizations." Compl. 15 (emphasis added). As Tooley's complaint should be liberally construed and the possibility exists that several government agencies apart from the TSA maintain watch lists, see Peter M. Shane, *The Bureaucratic Due Process of Government Watch Lists*, 75 Geo. Wash L. Rev. 804, 811 (2007) (discussing at least 12 terrorist or criminal watch lists maintained by the federal government), the district court erred in treating Tooley's claim as if it had been confined to TSA watch lists.

\* \* \*

We must therefore reverse. In regard to further proceedings, we note that once a plaintiff has overcome a standing challenge under our famously liberal pleading rules he is not automatically entitled to unlimited discovery. Federal Rule of Civil Procedure 26(b)(2) dictates that "the court must limit the frequency or extent of discovery . . . if it determines that . . . the burden or expense of the proposed

---

[1] The district court mistakenly cited to *48* U.S.C. § 46110, see *Tooley*, 2006 WL 3783142, at *26, though clearly referring to 49 U.S.C. § 46110.

discovery outweighs its likely benefit considering . . . the importance of the issues at stake in the action." Additionally, Federal Rule of Civil Procedure 56(f) states that where the party opposing a motion for summary judgment claims inability to "present facts essential to justify its opposition," "the court may" order a continuance to permit discovery to occur, a highly discretionary power. See *Donofrio v. Camp*, 470 F.2d 428, 431-32 (D.C. Cir. 1972) ("The rules governing discovery, including Fed. R. Civ. P. 56(f), are to be construed liberally to prevent injustice, but they do not require a trial judge to countenance repeated abuses of the discovery process or to let discovery go on indefinitely in a groundless suit."). Moreover, discovery relating to national security may present exceptional problems, as in some contexts a pattern of government answers (denying specific conduct in some cases, refusing to answer on national security grounds in others) would constitute a de facto disclosure of information not formally disclosed. Cf. *Bassiounia v. C.I.A*, 392 F.3d 244, 246 (7th Cir. 2004) ("When a pattern of responses itself reveals classified information, the only way to keep secrets is to maintain silence uniformly."). And finally we observe that "[i]n most cases," an assertion by the government that disclosure of "communications collections and analysis capabilities" would jeopardize the "intelligence collection mission" may be sufficient to foreclose discovery and sustain a claim of privilege. *Halkin v. Helms*, 598 F.2d 1, 9 (D.C. Cir. 1978) (internal quotations omitted) (upholding, after an in camera examination, an assertion of the state secrets privilege with respect to the mere fact of interception of plaintiff's foreign communications).

For the reasons stated above the judgment of the district court on Counts I, II, and III is reversed and the case is

*Remanded.*

SENTELLE, *Chief Judge*, *dissenting*: While the majority's opinion correctly describes the case before us and correctly identifies the controlling authorities, in my view the controlling authorities lead in the opposite direction than that taken by the majority. In other words, I would reach the same conclusion as the district court and therefore must respectfully dissent.

As the majority correctly notes, the Supreme Court's most recent pronouncement relevant to the sufficiency of a complaint to meet the notice standard of pleading required by Rule 8 of the Federal Rules of Civil Procedure is *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). In *Twombly*, the Court addressed the sufficiency of the complaint alleging liability under § 1 of the Sherman Act, 15 U.S.C. § 1, which "requires a 'contract, combination . . ., in restraint of trade or commerce.'" *Twombly*, 550 U.S. at 544, 127 S. Ct. at 1961. In that case, the Supreme Court considered specifically "whether a § 1 complaint can survive a motion to dismiss when it alleges that major telecommunications providers engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, as distinct from identical, independent action." *Id.* The Court "h[e]ld that such a complaint should be dismissed." *Id.*

The immediate question concerning the application of *Twombly* to the case before us is one posed by the *Twombly* dissent:

Whether the Court's actions [in *Twombly*] will benefit only defendants in antitrust treble-damages cases, or whether its test for the sufficiency of a complaint will inure to the benefit of all civil defendants, is a question that the future will answer.

*Id.* at 1988 (Stevens, J., dissenting).

As the majority seems to agree, nothing in the reasoning of the Court in *Twombly* suggests that its applicability is limited to antitrust litigation. Justice Souter for the Court engages in an analysis of Civil Rules jurisprudence that seems to apply to all litigation under the Rules, without limitation to the specific sort of litigation then before the Court. The gist of the Court's view is illuminated in a footnote to the majority's opinion responsive to the dissent.

> The dissent greatly oversimplifies matters by suggesting that the Federal Rules somehow dispensed with the pleading of facts altogether. While, for most types of cases, the Federal Rules eliminated the cumbersome requirement that a claimant "set out *in detail* the facts upon which he bases his claim," Rule 8(a)(2) still requires a "showing," rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only "fair notice" of the nature of the claim, but also "grounds" on which the claim rests. [The Rule] "contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented" and does not authorize a pleader's "bare averment that he wants relief and is entitled to it."

*Id.* at 1965 n.3 (citations omitted) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (emphasis added by *Twombly*), and 5 WRIGHT & MILLER § 1202, at 94). This analysis is not limited by the Court to one type of litigation subject to the Rules, but would appear to apply to all such litigation.

Rule 8(a) expressly establishes the following general rules of pleading:

Claim for Relief. A pleading that states a claim for relief must contain:

(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

The *Twombly* Court goes on to note "[t]he need at the pleading stage for allegations plausibly suggesting" the elements of the underlying theory of relief. 127 S. Ct. at 1966. This plausibility standard applied by the Court "reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'" *Id.* The applicability of this plausibility standard to litigation outside the Sherman Act context is established by the *Twombly* Court's further analysis in its reference to the "practical significance of the Rule 8 entitlement requirement." *Id.* The Court relies upon *Dura Pharmaceuticals, Inc. v. Brudo*, 544 U.S. 336 (2005), wherein it had explained "that something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with 'a largely groundless claim' be allowed to 'take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.'" *Twombly*, 127 S. Ct. at 1966 (quoting *Dura Pharmaceuticals*, 544 U.S. at 347) (other citations omitted). That said, the Court concluded that "'a district court must retain

the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.'" *Twombly*, 127 S. Ct. at 1967 (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983)). That same concern, in my view, animates the need for the ability of the district court to reject an implausible claim against the United States in, for example, the constitutional rights and national security area such as the case before us. Therefore, *Twombly* commands, I think sensibly, that the district court should be permitted to dismiss a complaint resting on implausible expressions of information and belief such as the one before us today as not stating a justiciable controversy, or otherwise put, a claim for relief.

I recognize, as the majority correctly notes, that we analyzed *Twombly* in *Aktieselskabet AF 21. November 2001 v. Fame Jeans, Inc.*, 525 F.3d 8 (D.C. Cir. 2008). Therein we held that "*Twombly* leaves the long-standing fundamentals of notice pleading intact." *Id.* at 15. I must agree that *Twombly* does not set some new standard of pleading, but I do believe that it reiterates a longstanding plausibility doctrine. Even before *Twombly*, courts could dismiss cases for lack of jurisdiction if the cases are "patently insubstantial." *Neitzke v. Williams*, 490 U.S. 319, 327 n.6 (1989); *see also Hagans v. Lavine*, 415 U.S. 528, 536 (1974). Likewise, the court could enter such dismissal when the case is "obviously frivolous," *Hannis Distilling Co. v. Baltimore*, 216 U.S. 285, 288 (1910). I further recognize that complaints can be based on "information and belief." I do not, however, think that in light of *Twombly* and the other cited authorities that "information and belief" can be a fanciful, paranoid, or irrational belief based on nothing more than the plaintiff's internal belief structure and still be sufficient to subject a defendant, or in this case the taxpayers, to the costs and burdens of litigation. Tooley's allegations are of this sort.

5

Tooley would have us hold that he has adequately alleged unlawful wiretapping of an entire extended family, including at least nine separate phone lines based on no apparent source of belief other than "problematic phone connections, including telltale intermittent clicking noises." I note in passing that there is no reason to believe that wiretaps even cause problematic connections or intermittent clicking sounds. Indeed, if this were the case, wiretaps would hardly have proved to be the useful tool they have in both criminal law enforcement investigations under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, §§ 2510-2520, Pub. L. No. 90-351, or national security under the Foreign Intelligence Surveillance Act, 50 U.S.C. §§ 1801-1862. However, even if plaintiff were correct in that supposition, he offers no basis for his "belief" that the taps, even if they occurred, were done illegally by the defendants named in the complaint.

The rest of his allegations are based on similar fanciful beliefs. As the majority notes, he interprets the presence of a black Crown Victoria in the vicinity of his home in the time surrounding a presidential visit in the same geographic area to mean that he is under an unlawful surveillance. While I readily concur that black Crown Victorias are often used by law enforcement, I cannot conclude that Tooley's alleging (by affidavit rather than in the complaint) that one such vehicle was in the vicinity of his residence is a plausible allegation that an unlawful surveillance of him by the defendants has occurred.

Plaintiff's allegations concerning airport searches and his conclusion concerning "watch lists" based on such searches add nothing to the sufficiency of this complaint. Stripped of his conclusory adjectives and adverbs, his allegations say that he has been searched or detained at airports. It is unlikely that anyone who flies with any frequency has not. If there is anything unconstitutional about any particular search to which

he has been subjected, then he should allege the facts that demonstrate its unconstitutionality. On the face of the complaint, he has not done so. If his allegations concerning airport searches were sufficient, I venture to say that many members of this court could file a similarly sufficient complaint.

In short, I would apply the plausibility doctrine illuminated by the Supreme Court's opinion in *Twombly* and conclude that the district court correctly dismissed the complaint. I would affirm, and therefore I must respectfully dissent.