**AMNESTY INTERNATIONAL USA, et al., Plaintiffs,**

v.

**John McCONNELL, et al., Defendants.**

**No. 08 Civ. 6259(JGK).**

United States District Court, S.D. New York.

Aug. 20, 2009.

Arthur Nelson Eisenberg, Christopher T. Dunn, New York Civil Liberties Union, New York, NY, Jameel Jaffer, Lori Danielle Tully, Melissa Goodman, Laurence Michael Schwartztol, American Civil Liberties Union Foundation, New York, NY, for Plaintiffs.

Serrin Andrew Turner, Laura Klein Abel, New York, NY, for Defendants.

## OPINION AND ORDER

JOHN G. KOELTL, District Judge.

This is a facial challenge to the constitutionality of Section 702 of the Foreign Intelligence Surveillance Act of 1978 ("FISA"), 50 U.S.C. § 1881a, which was added to FISA by Section 101(a)(2) of the FISA Amendments Act of 2008 (the "FAA"). In relevant part, the FAA amended FISA by creating a new framework within which federal officials may seek approval from the Foreign Intelligence Surveillance Court (the "FISC") to authorize surveillance targeting non-United States persons located outside the United States to acquire foreign intelligence information.

The plaintiffs are attorneys and organizations in the United States whose work necessitates international communications with people and organizations they believe to be likely targets of surveillance under the FAA. The defendants are the Director of National Intelligence, the Director of the National Security Agency and Chief of

the Central Security Service, and the Attorney General of the United States.[1]

The plaintiffs fear that their international communications will be monitored under the FAA. They make no claim that their communications have yet been monitored, and they make no allegation or showing that the surveillance of their communications has been authorized or that the Government has sought approval for such surveillance. However, the plaintiffs assert that they have an "actual and well-founded fear" of surveillance under the FAA and claim already to have incurred significant costs in taking steps to protect their international communications from surveillance. The plaintiffs challenge the FAA as unconstitutional under the Fourth Amendment, the First Amendment, and Article III of the Constitution.

The Government contends as a threshold matter that the plaintiffs lack standing to challenge the FAA. The Government also contends that the lawsuit lacks merit in any event because the FAA is constitutional on its face.

The parties have filed cross-motions for summary judgment. For the reasons explained below, the plaintiffs have failed to show that they have standing to bring their facial challenge to the statute.

I

A

Prior to the passage of the FAA, FISA created a framework for federal officials to apply for and obtain orders authorizing electronic surveillance where a significant purpose of the surveillance was to obtain foreign intelligence information. *See* 50 U.S.C. § 1804; *see also United States v. Duggan,* 743 F.2d 59, 77 (2d Cir.1984).[2] FISA established the FISC, comprised of judges appointed by the Chief Justice of the United States, with jurisdiction to hear applications for and to grant orders approving electronic surveillance "in aid of protecting the United States against attack by foreign governments or international terrorist groups." *United States v. Rahman,* 861 F.Supp. 247, 249 (S.D.N.Y. 1994), *aff'd,* 189 F.3d 88 (2d Cir.1999); *see also* 50 U.S.C. §§ 1801(e), 1803.

FISA required that each application for an order approving electronic surveillance be made by a federal officer upon oath or affirmation after approval by the Attorney General. 50 U.S.C. § 1804(a). An application was required to set forth the identity of the federal officer making the application; the identity, if known, of the target of the electronic surveillance; the facts upon which the applicant relied in concluding that the target of the electronic surveillance was a foreign power or an agent of a foreign power and that each of the facilities or places at which the surveillance was directed was being used, or was about to be used, by a foreign power or agent thereof; a statement of proposed minimization procedures; the type of information sought and the means by which surveillance would be effected; a statement concerning the previous applications sought; and a statement of the period of time for which the surveillance was required to be maintained. 50 U.S.C. § 1804(a)(1)-(9).

---

**1.** Attorney General Eric H. Holder, Jr., should be automatically substituted for former Attorney General Michael B. Mukasey as a defendant, and the caption of this case changed accordingly. *See* Fed.R.Civ.P. 25(d).

**2.** Prior to October 26, 2001, the date on which the Patriot Act became effective, FISA required that obtaining foreign intelligence information be "the purpose" of electronic surveillance, rather than "a significant purpose." *See United States v. Sattar,* No. 02 Cr. 395, 2003 WL 22137012, at *3 & n. 3 (S.D.N.Y. Sept. 15, 2003).

The application had to be approved by the Attorney General upon the Attorney General's finding that it satisfied the criteria and requirements of such an application. 50 U.S.C. § 1804(a). The application had to include a certification from a high ranking executive officer employed in the area of national security or defense that the information sought was foreign intelligence information as defined by 50 U.S.C. § 1801(e). 50 U.S.C. § 1804(a)(6). Foreign intelligence information included information relating to the ability of the United States to protect against international terrorism, and "information with respect to a foreign power or foreign territory that relates to ... the conduct of the foreign affairs of the United States," among other things. 50 U.S.C. § 1801(e). FISA required that the certification include a statement that the information sought could not reasonably be obtained by normal investigative techniques and designating the type of foreign intelligence information sought in accordance with § 1801(e). 50 U.S.C. § 1804(a)(6). Finally, after the passage of the Patriot Act, the executive officer was required to certify that "a significant purpose of the surveillance is to obtain foreign intelligence information." 50 U.S.C. § 1804(a)(6).

Prior to approving the requested electronic surveillance, a FISC judge had to find that: (1) the application was made by a federal officer and approved by the Attorney General; (2) there was probable cause on the basis of the application to believe that the target of the electronic surveillance was a foreign power or agent of a foreign power, and that each of the facilities or places at which the electronic surveillance was directed was being used, or was about to be used, by a foreign power or an agent of a foreign power; (3) the proposed minimization procedures met the definition of minimization procedures set forth in § 1801(h); and (4) the application contained all statements and certifica-

tions required under § 1804. 50 U.S.C. § 1805(a).

Pursuant to FISA, a FISC judge who was satisfied that an application met the statutory requirements was required to enter an ex parte order approving the requested electronic surveillance. 50 U.S.C. § 1805(a). Such an order was required to specify the identity of the target of the surveillance; the location of each of the facilities or places at which the surveillance would be directed; the type of information sought and communications or activities to be subjected to the surveillance; the means by which the surveillance would be effected; and the period of time for which the surveillance was approved; and to direct that the minimization procedures be followed. 50 U.S.C. § 1805(c).

The FISA framework governed applications for orders authorizing electronic surveillance to obtain foreign intelligence information, including surveillance of communications between persons located within the United States ("domestic communications") and surveillance of communications between persons located within the United States and persons located outside the United States ("international communications"). FISA defined "electronic surveillance" to include:

(1) the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire or radio communication sent by or intended to be received by a particular, known United States person who is in the United States, if the contents are acquired by intentionally targeting that United States person, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes; (2) the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire communication to or from a person in the United States,

without the consent of any party thereto, if such acquisition occurs in the United States, but does not include the acquisition of those communications of computer trespassers that would be permissible under section 2511(2)(i) of Title 18;

(3) the intentional acquisition by an electronic, mechanical, or other surveillance device of the contents of any radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes, and if both the sender and all intended recipients are located within the United States; or

(4) the installation or use of an electronic, mechanical, or other surveillance device in the United States for monitoring to acquire information, other than from a wire or radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes.

50 U.S.C. § 1801(f). The FISA requirements thus applied to the surveillance of international wire communications (including telephone and email communications) provided that the surveillance occurred in the United States. 50 U.S.C. § 1801(f)(2). The FISA requirements did not apply to the surveillance of international radio communications, or to surveillance of international wire communications that did not take place in the United States,[3] unless such surveillance targeted a known United States person located in the United States. *See* 50 U.S.C. §§ 1801(f)(1–2).[4]

## B

The FAA was signed into law on July 10, 2008. The FAA leaves much of the preexisting FISA framework intact. However, new Section 702 of FISA, added by Section 101(a)(2) of the FAA and codified at 50 U.S.C. § 1881a, sets forth a new framework displacing the preexisting FISA framework where the Government seeks approval from the FISC to authorize surveillance targeting non-United States persons located outside the United States to acquire foreign intelligence information. Under the FAA, "[n]otwithstanding any other provision of law, upon the issuance of an order in accordance with [50 U.S.C. § 1881a(i)(3)] or a determination under [50 U.S.C. § 1881a(c)(2)], the Attorney General and the Director of National Intelligence may authorize jointly, for a period of up to 1 year from the effective date of the authorization, the targeting of persons reasonably believed to be located outside the United States to acquire foreign intelligence information." 50 U.S.C. § 1881a(a).

In order to authorize surveillance under the FAA, the Attorney General and the Director of National Intelligence must apply for and obtain an order authorizing such surveillance from the FISC. 50 U.S.C. §§ 1881a(a) & (i)(3).[5] The applica-

---

**3.** The plaintiffs represent that at the time FISA was passed, approximately half of Americans' international communications were transmitted by radio or satellite, the monitoring of which Congress did not regulate. The Government represents that the percentage was greater than half.

**4.** FISA defines "United States person" to mean a citizen of the United States or an alien lawfully admitted for permanent residence, in relevant part. 50 U.S.C. § 1801(i).

**5.** The FAA provides an exception where the Attorney General and the Director of National Intelligence determine that exigent circumstances exist because, without immediate implementation of an authorization of surveillance, intelligence important to the national security of the United States may be lost or not timely acquired and time does not permit the issuance of an order pursuant to 50 U.S.C. § 1881a(i)(3) prior to the implementation of such authorization. 50 U.S.C. § 1881a(c)(2). In the case of a determination of exigent circumstances pursuant to 50

tion consists of providing a written certification and any supporting affidavit, under oath and under seal, to the FISC. The certification must attest, among other things, that a significant purpose of the requested surveillance is to obtain foreign intelligence information; that the surveillance involves obtaining such information from or with the assistance of an electronic communications service provider; and that the surveillance complies with certain limitations set forth in § 1881a(b). 50 U.S.C. § 1881a(g)(2)(A)(v-vii).

Pursuant to the limitations set forth in § 1881a(b), the requested surveillance may not intentionally target any person known at the time of the surveillance to be located in the United States; any person reasonably believed to be located outside the United States if the purpose of such surveillance is to target a particular, known person reasonably believed to be in the United States; or any United States person reasonably believed to be located outside the United States. 50 U.S.C. § 1881a(b)(1–3). Moreover, the requested surveillance may not intentionally acquire communications known at the time of the surveillance to be domestic communications, 50 U.S.C. § 1881a(b)(4), although it may intentionally acquire international communications.[6] Section 1881a(b) also provides that the requested surveillance must be conducted in a manner consistent with the Fourth Amendment. 50 U.S.C. § 1881a(b)(5).

The certification must attest that guidelines have been adopted in accordance with 50 U.S.C. § 1881a(f) to ensure compliance with the limitations in § 1881a(b) and to ensure that an application for a court order is filed as required by § 1881a. 50 U.S.C. § 1881a(g)(2)(A)(iii). In addition, such guidelines must be provided to the congressional intelligence committee and the Committees on the Judiciary of the Senate and the House of Representatives, as well as the FISC. 50 U.S.C. § 1881a(f)(2). The certification must attest that such guidelines are consistent with the Fourth Amendment. 50 U.S.C. § 1881a(g)(2)(A)(iv).

The certification must attest that the Government has targeting and minimization procedures in place that have been approved by the FISC or have been submitted to the FISC for approval or will be submitted with the certification. 50 U.S.C. § 1881a(g)(2)(A)(i-ii). The certification must also include the actual procedures and attest that they comply with the Fourth Amendment. 50 U.S.C. § 1881a(g)(2)(B) & (g)(2)(A)(iv). "Targeting procedures" are procedures reasonably designed to ensure that the requested surveillance is limited to targeting persons reasonably believed to be located outside the United States, and to prevent the intentional surveillance of communications known to be domestic communications at the time of the surveillance. 50 U.S.C. § 1881a(d)(1) & (g)(2) (A)(i). "Minimization procedures" for purposes of electronic surveillance under the FAA must meet the definition of minimization procedures for purposes of electronic surveillance under FISA. Minimization procedures are:

(1) specific procedures, which shall be adopted by the Attorney General, that

U.S.C. § 1881a(c)(2), the Attorney General and the Director of National Intelligence must undertake as soon as practicable, but in no event later than 7 days after such determination is made, to fulfill the same requirements ordinarily imposed before an order authorizing surveillance under the FAA may be obtained from the FISC. 50 U.S.C. § 1881a(g)(1)(B).

6. Insofar as the FAA regulates the surveillance of international radio communications to obtain foreign intelligence information, it establishes regulations where none existed under FISA.

are reasonably designed in light of the purpose and technique of the particular surveillance, to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information;

(2) procedures that require that nonpublicly available information, which is not foreign intelligence information, as defined in [50 U.S.C. § 1801(e)(1) ], shall not be disseminated in a manner that identifies any United States person, without such person's consent, unless such person's identity is necessary to understand foreign intelligence information or assess its importance; [and]

(3) notwithstanding paragraphs (1) and (2), procedures that allow for the retention and dissemination of information that is evidence of a crime which has been, is being, or is about to be committed and that is to be retained or disseminated for law enforcement purposes[.]

50 U.S.C. § 1801(h).[7]

The certification required by the FAA must be supported, as appropriate, by the affidavit of any appropriate official in the area of national security who is appointed by the President, by and with the advice and consent of the Senate, or who is the head of an element of the intelligence community. 50 U.S.C. § 1881a(g)(2)(C). The certification must include an effective date for the authorization that is at least 30 days after the submission of the certification to the FISC; or, if the acquisition has

begun or the effective date is less than 30 days after the submission of the certification to the FISC, the date the acquisition began or the effective date of the acquisition. 50 U.S.C. § 1881a(g)(2)(D).

The FISC has jurisdiction to review a certification for electronic surveillance under the FAA, including the targeting and minimization procedures that were adopted by the Attorney General in consultation with the Director of National Intelligence. 50 U.S.C. § 1881a(i)(1)(A). The FAA provides that the FISC shall review the certification, the targeting procedures and the minimization procedures to ensure that they comply with all of the requirements discussed above. 50 U.S.C. § 1881a(i)(2). If the FISC finds that the certification contains all the required elements and the targeting and minimization procedures are in compliance with the statute and with the Fourth Amendment, it must issue an order granting the Government approval to authorize the requested surveillance. 50 U.S.C. § 1881a(i)(3)(A). The FISC must complete its review and issue an order with respect to an application for an order authorizing surveillance no more than 30 days after the date on which the certification and the targeting and minimization procedures are submitted for approval. 50 U.S.C. § 1881a(i)(1)(B).

The FAA allows for the Government to appeal an order rejecting an application for a surveillance order to the FISA Court of Review. The Court of Review must decide an appeal no more than 60 days from the date the appeal is filed. The Government is permitted to continue any

---

7. Section 1801(h) includes a fourth requirement for minimization procedures where surveillance is conducted pursuant to 50 U.S.C. § 1802(a). Surveillance conducted under § 1802(a) is solely directed at communications transmitted by means of communications used exclusively between or among foreign powers, among other things, and may be authorized without a court order if the requirements of that section are satisfied. 50 U.S.C. § 1802(a). Surveillance conducted pursuant to the FAA is not subject to the minimization requirement set forth in § 1801(h) that applies only to surveillance conducted pursuant to § 1802(a).

surveillance affected by a FISC order while an appeal to the Court of Review is pending, or while any rehearing of the FISC order by the FISC en banc is pending. The Government may file a petition for a writ of certiorari with the Supreme Court for review of a decision of the Court of Review. 50 U.S.C. § 1881a(i)(4).

The FAA provides for a semiannual assessment of compliance with the targeting and minimization procedures adopted in accordance with 50 U.S.C. §§ 1881a(d) and (e) and the guidelines adopted in accordance with § 1881a(f). The FAA provides that each assessment shall be made by the Attorney General and the Director of National Intelligence, and submitted to the FISC, the congressional intelligence committees, and the Committees on the Judiciary of the House of Representatives and the Senate.[8] 50 U.S.C. § 1881a(l).

The FAA also provides that the Inspector General of the Department of Justice and the Inspector General of each element of the intelligence community authorized to acquire foreign intelligence information under § 1881a are authorized to review compliance with the targeting and minimization procedures adopted under §§ 1881a(d) and (e) and the guidelines adopted under § 1881a(f). With respect to surveillance authorized under § 1881a, those officials are required to review the number of disseminated intelligence reports containing a reference to a United States person identity and the number of United States person identities subsequently disseminated by the element concerned in response to requests for identities that were not referred to by name or title in the original reporting. They are also required to review the number of targets that were later determined to be located in the United States and, to the extent possible, whether communications of such targets were reviewed. They must provide each such review to the Attorney General, the Director of National Intelligence, the congressional intelligence committees, and the Committees on the Judiciary of the House of Representatives and the Senate. 50 U.S.C. § 1881a(l)(2).

Finally, the FAA provides for the head of each element of the intelligence community conducting surveillance authorized under § 1881a to conduct an annual review to determine whether there is reason to believe that foreign intelligence information has been or will be obtained from the surveillance. The annual review is required to provide an accounting of the number of disseminated intelligence reports containing a reference to a United States person identity; an accounting of the number of United States person identities subsequently disseminated by that element in response to requests for identities that were not referred to by name or title in the original reporting; the number of targets that were later determined to be located in the United States and, to the extent possible, whether communications of such targets were reviewed; and a description of any procedures developed by the head of such element of the intelligence community and approved by the Director of National Intelligence to assess, in a manner consistent with national security, operational requirements and the privacy interests of United States persons, the extent to which the surveillance authorized under § 1881a acquires the communications of United States persons, and the results of any such assessment. 50 U.S.C. § 1881a(l)(3)(A). The purpose of the annual review is to evaluate the adequacy of

---

**8.** The submission of semiannual assessments to the congressional committees, under this provision and all other provisions in the FAA, is subject to the Rules of the House of Representatives, the Standing Rules of the Senate, and Senate Resolution 400 of the 94th Congress or any successor Senate resolution. 50 U.S.C. § 1881a(l)(B).

the minimization procedures used and, as appropriate, the application of the minimization procedures to a particular surveillance. 50 U.S.C. § 1881a(*l*)(3)(B). The annual reviews are to be provided to the FISC, the Attorney General, the Director of National Intelligence, the congressional intelligence committees, and the Committees on the Judiciary of the House of Representatives and the Senate. 50 U.S.C. § 1881a(*l*)(3)(C).[9]

In applying for an order from the FISC approving the authorization of surveillance under the FAA, the Government is not required to identify the specific facilities, places, premises, or property at which the surveillance will be directed or conducted. 50 U.S.C. § 1881g(4). The Government is also not required to identify the specific targets of the requested surveillance or to show probable cause that the prospective targets of the surveillance are foreign powers or agents thereof.

## II

The plaintiffs move for summary judgment declaring the FAA unconstitutional, and the Government moves for summary judgment dismissing the plaintiffs' constitutional challenge. Summary judgment may not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir.2008); *New York State Motor Truck Ass'n v. Pataki*, No. 03 Civ. 2386, 2004 WL 2937803, at *3 (S.D.N.Y. Dec. 17, 2004).

Although both parties have moved for summary judgment, the only factual submissions in the record are those made by the plaintiffs. In opposing the plaintiffs' motion for summary judgment, and in responding to the plaintiffs' Statement of Undisputed Facts pursuant to Local Rule 56.1 (the plaintiffs' "56.1 Statement" or "56.1 Stmt."), the Government makes no reference to any evidence except that submitted by the plaintiffs. Moreover, the Government submits no facts in support of its own motion for summary judgment. At oral argument, the Government clarified that it was accepting the factual submissions of the plaintiffs as true for purposes of these motions. (Tr. 48–49.) Of course, that does not imply the acceptance of any legal conclusions embedded in the plaintiffs' 56.1 statement. *See, e.g., Alliance Sec. Products, Inc. v. Fleming Co.*, 471 F.Supp.2d 452, 454 & n. 8 (S.D.N.Y.2007) (legal arguments in Rule 56.1 Statement disregarded in determining whether there are genuine issues of material fact).[10]

---

**9.** The FAA also provides a framework for directives to be issued by the Attorney General and the Director of National Intelligence to electronic communication service providers in order to carry out surveillance authorized under § 1881a, and for judicial review of such directives. *See* 50 U.S.C. § 1881a(h).

**10.** The plaintiffs argue in passing that the defendants should not be entitled to summary judgment because they failed to submit a 56.1 Statement in support of their motion for summary judgment. However, the Court can dispense with the requirement of a 56.1 Statement, *see Hadden v. Bureau of Prisons*, No. 07

Civ. 8586, 2008 WL 5429823, at *5 (Dec. 22, 2008) (citing *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 109 n. 2 (2d Cir.2006)), and it would make no sense to require such a statement from the defendants in this case because they are prepared to accept the plaintiffs' allegedly undisputed facts, the conditional acceptance of which is in any event the consequence of failing to submit a 56.1 Statement. *Cf. Cosy Goose Hellas v. Cosy Goose U.S.A. Lt.*, 581 F.Supp.2d 606, 616–17 (S.D.N.Y.2008).

Moreover, when the plaintiffs' standing has been challenged on a motion for summary judgment the plaintiffs must come forward with sufficient evidence to show that there is

Accordingly, the following facts are undisputed.[11] The plaintiffs are attorneys and human rights, labor, legal, and media organizations whose work requires them to engage in sensitive and sometimes privileged telephone and email communications with colleagues, clients, journalistic sources, witnesses, experts, foreign governmental officials, and victims of human rights abuses located outside the United States. (Pl.'s 56.1 Stmt. ¶ 9(A).) Some of the plaintiffs communicate by telephone and email with people the United States Government believes or believed to be associated with terrorist organizations. (Pl.'s 56.1 Stmt. ¶ 9(B).) Some of the plaintiffs communicate by telephone and email with political and human rights activists who oppose governments that are supported economically or militarily by the United States Government. (Pl.'s 56.1 Stmt. ¶ 9(C).) Some of the plaintiffs communicate by telephone and email with people located in geographic areas that are a special focus of the United States Government's counterterrorism or diplomatic efforts. (Pl.'s 56.1 Stmt. ¶ 9(D).)

All of the plaintiffs exchange information that constitutes foreign intelligence information within the meaning of the FAA. (Pl.'s 56.1 Stmt. ¶ 9(E).) The plaintiffs believe that their communications will be monitored under the FAA, and that those communications will be retained, analyzed, and disseminated by the Government. (Pl.'s 56.1 Stmt. ¶ 9(F).) This belief has affected the way the plaintiffs do their jobs. (Pl.'s 56.1 Stmt. ¶ 9(G).) Namely, the plaintiffs feel constrained in locating witnesses, cultivating sources, gathering information, and communicating confiden-

tial information to their clients, among other things. (Pl.'s 56.1 Stmt. ¶ 9(H).) The plaintiffs have ceased engaging in certain conversations on the telephone and by email. (Pl.'s 56.1 Stmt. ¶ 9(I).) The attorney plaintiffs have an ethical obligation to avoid communicating confidential information about client matters over telephone, fax, or email if they have reason to believe that it is likely to be intercepted by others. (Pl.'s Supplemental 56.1 Stmt. ¶ 2(J).)

The plaintiffs have incurred costs in seeking to protect the confidentiality of sensitive and privileged communications. (Pl.'s 56.1 Stmt. ¶ 9(J).) Some of the plaintiffs now travel long distances to meet personally with individuals instead of communicating with those individuals over telephone or email. (Pl.'s 56.1 Stmt. ¶ 9(K).) On the whole, the plaintiffs' reaction to the FAA has affected their work more than their reaction to previous regulatory enactments providing frameworks for Government surveillance. (Pl.'s 56.1 Stmt. ¶ 9(L).)

### III

The plaintiffs argue that on its face, the FAA violates the Fourth Amendment, the First Amendment, and Article III of the Constitution. The plaintiffs argue under the Fourth Amendment that the FAA fails to protect the privacy interest of Americans in the content of their telephone calls and emails. They argue under the First Amendment that the FAA chills the constitutionally protected speech of Americans who fear that their telephone calls and emails will be subject to surveillance. They argue under Article III that the pro-

---

a genuine material issue as to their standing to warrant a trial. *See Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 53–54, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). If the plaintiffs fail to meet this standard, then summary judgment should be granted dismissing their complaint.

11. The Court only recites those facts set forth by the plaintiffs that are material to the disposition of these motions. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

cess of judicial review set forth in the FAA violates the principle of the separation of powers by allowing the FISC to issue orders approving the authorization of surveillance in the absence of any case or controversy and by allowing for the Government to continue surveillance while an appeal to the FISC Court of Review is pending.

In order to reach the merits of the plaintiffs' constitutional arguments, the Court must first determine whether the plaintiffs have standing to bring this action. *See, e.g., Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."); *Ontario Public Service Employees Union Pension Trust Fund v. Nortel Networks Corp.,* 369 F.3d 27, 34 (2d Cir.2004) ("In order for our court to properly reach the merits of the case ... we must first find that the parties involved have met the basic requirements of standing."); *Local 851 of International Brotherhood of Teamsters v. Thyssen Haniel Logistics, Inc.,* Nos. 95 Civ. 5179, 02 Civ. 6250, 2004 WL 2269703, at *5 (E.D.N.Y. Sept. 30, 2004) ("Standing is a jurisdictional prerequisite; accordingly, the Court must initially determine whether [the plaintiff] has standing to invoke the jurisdiction of the federal courts to determine the merits of the underlying disputes.") (internal citation and quotation marks omitted).

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To satisfy the irreducible constitutional minimum of Article III standing, a plaintiff must show that (1) it has suffered an actual or imminent injury in fact, that is concrete and particularized, and not conjectural or hypothetical; (2) there is a causal connection between the injury and the defendant's actions; and (3) it is likely that a favorable decision in the case will redress the injury. *Id.* at 560–61, 112 S.Ct. 2130. "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561, 112 S.Ct. 2130.

Because the judicial power of federal courts "exists only to redress or otherwise protect against injury to the complaining party," a federal court's jurisdiction "can be invoked only when the plaintiff ... has suffered 'some threatened or actual injury resulting from the putatively illegal action ....'" *Warth,* 422 U.S. at 499, 95 S.Ct. 2197 (quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)). The plaintiff must show a particularized injury that affects the plaintiff in a personalized and individual way. *Lujan,* 504 U.S. at 560 n. 1, 112 S.Ct. 2130. Only a plaintiff so injured has "'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth,* 422 U.S. at 498–99, 95 S.Ct. 2197 (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).

Apart from the irreducible constitutional minimum, the Supreme Court has also recognized other prudential limitations on the class of persons who may invoke the federal judicial power. "[T]he Court has held that when the asserted grievance is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Warth,* 422 U.S. at 499, 95 S.Ct. 2197. The Court has also held that the plaintiff must generally assert the plaintiff's own rights, and cannot rest on the legal rights or interests of third parties. *Id.* This case turns on whether the plaintiffs have met the irredu-

cible constitutional minimum of personal, particularized, concrete injury in fact without turning to the additional prudential aspects of standing.

The plaintiffs advance what they characterize as two independent bases for Article III standing to challenge the constitutionality of the FAA. First, the plaintiffs argue that they have standing on the basis of their fear that their communications will be monitored under the FAA because that fear is "actual and well-founded." Second, the plaintiffs argue that they have standing on the basis of the costs they have incurred in taking measures to protect the confidentiality of their international communications, in light of their fear of surveillance. The Court addresses each proffered basis for standing in turn.

## A

■ The plaintiffs argue that their fear of surveillance under the FAA provides a basis for Article III standing to challenge the constitutionality of that statute. They seize upon case law indicating that in the context of a pre-enforcement challenge to a statute on First Amendment grounds, a plaintiff need only demonstrate " 'an actual and well-founded fear that the law will be enforced against' it" to satisfy the injury-in-fact requirement for Article III standing. *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir.2000) (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988)); *see also Am. Booksellers Foundation v. Dean*, 342 F.3d 96, 101 (2d Cir.2003).[12] The plaintiffs urge

**12.** The Court of Appeals for the Second Circuit has indicated that the standard of showing an "actual and well-founded fear" of enforcement is "slightly" easier to satisfy than the standard of showing a "realistic danger" of enforcement that applies to non-First Amendment pre-enforcement challenges to a statute. *Am. Booksellers*, 342 F.3d at 101 (internal quotation marks omitted). The plaintiffs argue that the "actual and well-founded fear" standard should apply to the determination of standing with respect to all of their claims, rather than the First Amendment claim alone, because the alleged conduct that is the source of the injuries asserted under each constitutional claim—the potential enforcement of the statute—implicates First Amendment rights. The difference between the "actual and well-founded fear" standard and the "realistic danger" standard has never been explained, and it should be noted that there are some indications that there is no meaningful difference between the two standards. *See Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 227 (2d Cir.2006) (finding standing for as-applied First Amendment challenge based on "actual and well-founded fear" and "realistic danger"); *cf. Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (invoking "realistic danger" standard in First Amendment context). In any event, any difference between the "actual and well-founded fear" standard

and the "realistic danger" standard has no bearing on the outcome of this case, and the parties agree that Article III standing should be assessed under a single standard with respect to all of the plaintiffs' claims. (Tr. 12, 54.) Therefore, the Court applies the "actual and well-founded fear" standard to all of the challenges to the FAA.

In addition, because the potential enforcement of the challenged statute accounts for all of the injuries asserted under each constitutional claim; the parties agree that Article III standing should be assessed under a single standard with respect to all of the plaintiffs' claims; and separate standing analyses for each constitutional claim would not affect the outcome of this case, the Court does not undertake a separate standing analysis with respect to each alleged constitutional violation. *See Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 78, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (holding that plaintiffs need not "demonstrate a connection between the injuries they claim and the constitutional rights being asserted"); *United Presbyterian Church in the United States of America v. Reagan*, 738 F.2d 1375 (D.C.Cir.1984) (Scalia, J.) (conducting collective standing analysis for First, Fourth, and Fifth Amendment claims and separation of powers claims); *cf. Friends of the Earth v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (standing must be demonstrated sepa-

that their fear of surveillance is "actual and well-founded" because, according to the plaintiffs, "the FAA *authorizes* the government to monitor plaintiffs' international communications" and "plaintiffs' communications are *likely* to be collected under the challenged law" based on the nature of the communications and the identity of the persons with whom the plaintiffs communicate. (Pl.'s Reply Br. 4.) (emphasis in original).

The Government argues that the plaintiffs' fear that their communications will be monitored under the FAA does not confer standing on the plaintiffs to challenge the constitutionality of that statute. The Government contends that standing to make a pre-enforcement challenge to a statute may only be found "where there is a threat of imminent enforcement of a specific proscription that demonstrably applies to a plaintiff's actions" (Gov't Reply Br. 2–3), and that no such basis for a pre-enforcement challenge to the FAA exists here.

The plaintiffs have failed to establish standing to challenge the constitutionality of the FAA on the basis of their fear of surveillance. The plaintiffs can only demonstrate an abstract fear that their communications will be monitored under the FAA. The FAA creates a framework within which intervening federal officials may apply for approval from the FISC to authorize surveillance targeting non-United States persons located outside the United States to acquire foreign intelligence information. The FAA sets forth the requirements that an application to obtain a surveillance order from the FISC must satisfy. Contrary to the characterization of the statute in the plaintiffs' motion papers, the FAA itself does not authorize the surveillance of the plaintiffs' communications. Indeed, the FAA neither authorizes surveillance nor identifies on its face a class of persons that includes the plain-

tiffs. Rather the FAA authorizes specified federal officials to seek a surveillance order from the FISC. That order cannot target the plaintiffs and whether an order will be sought that affects the plaintiffs' rights, and whether such an order would be granted by the FISC, is completely speculative.

### 1.

Courts have explicitly rejected standing based on a fear of surveillance in circumstances similar to those in this case. In *United Presbyterian Church in the United States of America v. Reagan,* 738 F.2d 1375 (D.C.Cir.1984) (Scalia, J.), the Court of Appeals for the District of Columbia Circuit denied standing to plaintiffs seeking to challenge the constitutionality of Executive Order No. 12333 (the "Executive Order"). The Executive Order created a framework within which intelligence agencies could apply to the Attorney General for approval to collect, retain or disseminate certain kinds of intelligence information. *See* Executive Order No. 12333 at ¶¶ 2.3, 2.5. The Executive Order set forth the kinds of information that could be collected and established limitations on permissible collection techniques, including electronic surveillance under certain circumstances. Executive Order No. 12333 at ¶¶ 2.3, 2.4, 2.5. The plaintiffs were political and religious organizations that the Court assumed were more likely than the public at large to be subject to surveillance under the Executive Order. *See United Presbyterian,* 738 F.2d at 1380. The Court rejected the plaintiffs' attempt to rely upon the "threat" of surveillance for standing to challenge the Executive Order, explaining that "[t]he problem with [the plaintiffs'] attempt to rely upon this sort of harm to establish standing in the present case is that they have not adequately averred that any specific action is threat-

rately for injunctive relief and civil penalties

because these are different forms of relief).

ened or even contemplated against them." *Id.* The Court observed that "[t]o give these plaintiffs standing on the basis of threatened injury would be to acknowledge, for example, that all churches would have standing to challenge a statute which provides that search warrants may be sought for church property if there is reason to believe that felons have taken refuge there. That is not the law." *Id.*

The plaintiffs' attempt to rely upon their fear of surveillance as a basis for standing in this case is not materially distinguishable from the attempt that was rejected in *United Presbyterian.* As in *United Presbyterian,* the plaintiffs in this case have not shown that any specific action is threatened or even contemplated against them. They have not shown or alleged that the Government has sought or obtained approval from the FISC to authorize surveillance of their communications. They have not shown or alleged that surveillance of their communications has ever taken place under the challenged statute. They only allege a fear, based on a perceived likelihood, that their communications will be surveilled. But absent any showing that such surveillance has been conducted, authorized or even contemplated, the plaintiffs' fear is speculative.

Moreover, the alleged injury in this case is even more speculative than the injury asserted in *United Presbyterian* because the FAA requires a court to approve the application for surveillance, which includes making an independent judgment with respect to whether the guidelines proposed by the Executive Branch to circumscribe the requested surveillance comply with the Fourth Amendment. The intervening role carved out for the Judicial Branch in the FAA makes the plaintiffs' assertion of

standing on the basis of their fear of surveillance uniquely attenuated.

Arguments for standing similar to those asserted by the plaintiffs here were also rejected by the Court of Appeals for the Sixth Circuit in *ACLU v. NSA,* 493 F.3d 644 (6th Cir.2007). *ACLU* involved a challenge to the constitutionality of the Terrorist Surveillance Program (the "TSP") conducted by the National Security Agency (the "NSA"). The TSP entailed the warrantless interception of telephone and email communications with respect to which one party was located outside the United States and the NSA had a reasonable basis to conclude that one party was connected to al Qaeda. *See ACLU,* 493 F.3d at 648. The plaintiffs were journalists, academics and lawyers who regularly communicated with individuals located overseas whom they believed the NSA suspected of being connected to al Qaeda and whom they believed the NSA would therefore be likely to monitor under the TSP. *Id.* at 648–49. The *ACLU* decision was fragmented into three opinions: a lead opinion, a concurrence, and a dissent. Both the lead opinion and the concurring opinion rejected the plaintiffs' allegation that they had standing on the basis of their fear of surveillance pursuant to the TSP.[13]

The lead opinion rejected this basis for standing on the rationale that "it would be unprecedented for this court to find standing for plaintiffs to litigate a Fourth Amendment cause of action without any evidence that the plaintiffs themselves have been subjected to an illegal search or seizure." *Id.* at 673–74 (Batchelder, J.). The concurring opinion rejected standing on the grounds that the plaintiffs had not

---

**13.** The lead opinion only discussed this basis for standing in the context of determining whether the plaintiffs had standing to bring Fourth Amendment claims in connection with the TSP. However, the lead opinion denied the plaintiffs standing to bring any of their claims.

shown that they were "personally subject to" the warrantless surveillance policy. *Id.* at 691 (Gibbons, J., concurring). The concurring opinion drew an implicit distinction between proof of being subject to the surveillance policy and proof of having been subjected to actual surveillance pursuant to that policy. The former consisted of "evidence as to whether, in the government's view, there are reasonable grounds to believe that a party to the [plaintiffs'] communications is affiliated with al Qaeda." *Id.* at 690 (Gibbons, J., concurring) (internal quotation marks omitted). It was the failure to present such evidence that was fatal to the plaintiffs' assertion of standing. Relying on *United Presbyterian,* the concurring opinion distinguished cases involving "[a] genuine threat of enforcement of a policy against a plaintiff who is demonstrably subject to that policy," which supports standing, from cases "in which a plaintiff cannot establish that he is subject to the policy but merely fears that he is subject to the policy that may be enforced, which cannot support standing." *Id.* at 689 n. 2 (Gibbons, J., concurring). The plaintiffs could not demonstrate a genuine threat of surveillance because they could not show that they were subject to the challenged surveillance policy—that they would be targeted by the policy. *See id.* at 691 (Gibbons, J., concurring) ("There is no relevant factual difference between the *United Presbyterian Church* plaintiffs, whose activities the D.C. Circuit conceded made them more likely to be subject to surveillance, and the attorney-plaintiffs in this case, whose representation of exactly the types of clients targeted by the TSP makes them more likely to be targeted by the TSP") (internal citations omitted).

The plaintiffs in this case, like the plaintiffs in *ACLU* and *United Presbyterian,* have not made any showing that they are subject to the surveillance policy they seek to challenge. Without showing that they are subject to the statute they seek to challenge, the plaintiffs' fear that they will suffer harm from that statute is speculative and hypothetical.

Indeed, the plaintiffs in this case are one step further removed from the challenged surveillance policy than were the plaintiffs in *ACLU.* The plaintiffs in *ACLU* sought to challenge an actual program of surveillance that had already been authorized by the President. *See ACLU,* 493 F.3d at 648 n. 1. The TSP was more than a framework within which federal officials could apply for authorization to engage in surveillance. The NSA was already authorized to monitor communications with respect to which one party was located outside the United States and there was a reasonable basis to believe that one party was connected to al Qaeda. As the concurring opinion in *ACLU* explained, the plaintiffs in that case could not show that they were subject to that authorization of surveillance because they could not show that their communications fell into the class of communications that the NSA was authorized to monitor. By contrast, the FAA does not authorize surveillance but rather authorizes the FISC to do so pursuant to the procedures set forth in the statute. Thus the standing argument by the plaintiffs in this case is more speculative and hypothetical than the standing argument rejected by the Court of Appeals for the Sixth Circuit in *ACLU.* No case from within or outside the context of surveillance provides any basis to conclude that the speculative fear of harm asserted by the plaintiffs is sufficient to support standing for a pre-enforcement challenge to a statute.

### 2.

At oral argument the plaintiffs sought to minimize the persuasiveness of *United Presbyterian* and *ACLU,* which denied standing to plaintiffs who feared the surveillance of their communications, by pointing to "physical surveillance cases"

where the Supreme Court reached the merits of challenges to laws or policies authorizing drug or alcohol testing for specific classes of persons, without requiring that the plaintiffs had actually submitted to such testing before bringing such challenges. (Tr. 9 ("The cases I'm thinking of are cases like *Earls* and *Chandler* and *Skinner*.").) None of those physical search cases identified by the plaintiffs undermines the reasoning of the electronic surveillance cases or otherwise provides any support for the plaintiffs' standing argument. The physical search cases concerned plaintiffs who were in a defined class of persons subject to a challenged policy of drug or alcohol testing and who faced a genuine threat of being tested pursuant to that policy. In *Board of Education of Independent School District Number 92 of Pottawatomie County v. Earls,* 536 U.S. 822, 826 & n. 1, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002), the Supreme Court found that a student plaintiff who participated in competitive extracurricular activities at school had standing to challenge a Board of Education policy requiring all students participating in such activities to consent to drug testing. It was indisputable in *Earls* that the challenged policy required a student who participated in such extracurricular activities, such as the plaintiff, to take a drug test before participating in the activity, and to submit to random drug testing while participating in the activity at any time based on reasonable suspicion. *Earls,* 536 U.S. at 826, 122 S.Ct. 2559. *Earls* therefore has no application to this case, where the plaintiffs are not required to do anything or to submit to anything, and where there is no showing that the Government has authorized any action against the plaintiffs. *See also Chandler v. Miller,* 520 U.S. 305, 308–09, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997) (ruling on merits, without discussing standing, where plaintiff candidates for state offices challenged state law requiring candidates for such offices to certify that they had taken a urinalysis drug test within 30 days prior to qualifying for nomination and that the test results were negative).

Among the drug or alcohol testing cases, the plaintiffs place particular emphasis on *Skinner v. Railway Labor Executives' Association,* 489 U.S. 602, 611, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), in which the Supreme Court upheld on the merits regulations authorizing railroads to conduct drug and alcohol testing of railroad employees after certain accidents, in the event of certain rule violations, or where a supervisor had a reasonable suspicion based on personal observation that an employee was under the influence of alcohol. *Skinner* provides little guidance for the standing analysis in this case because standing was not contested in that case. It was not discussed by the Supreme Court, the issue was not briefed before the Court, and the appellate court decision contained no discussion of standing. *See Ry. Labor Executives' Ass'n v. Burnley,* 839 F.2d 575 (9th Cir.1988).

To the extent that the Supreme Court implicitly determined that there was standing in *Skinner* as a necessary prerequisite to jurisdiction, nothing about that determination affects the standing analysis in this case. The regulations at issue in *Skinner* authorized drug or alcohol testing of a defined class of persons represented by the plaintiff labor organizations, namely railroad employees. The plaintiffs were plainly subject to the challenged policy. By contrast, the FAA neither authorizes surveillance nor identifies, on its face, a class of persons to which the plaintiffs belong, and there is no allegation or evidence of an order authorizing Government surveillance that would encompass the plaintiffs' communications. Thus the relation in which the railroad employees stood

to the challenged policy in *Skinner* is wholly unlike the relation in which the plaintiffs in this case stand to the FAA.

### 3.

Thus the electronic surveillance cases undermine any claim of standing in this case, and the drug or alcohol testing cases on which the plaintiffs rely do not support the plaintiffs' claims of standing to challenge the FAA based on their fear of surveillance. However, the plaintiffs urge the Court to look beyond surveillance cases. (*See* Tr. 11 ("Surveillance is just like any other context .... [I]t's a completely artificial distinction between surveillance cases [and] other contexts.").) The plaintiffs claim that their position is supported by cases outside the surveillance context considering the issue of standing to make a pre-enforcement challenge to a statute or regulation. They argue that under those cases they have shown an "actual and well-founded fear of enforcement" of the FAA against them that is sufficient for standing in this case.

The plaintiffs' reliance on non-surveillance cases considering pre-enforcement challenges to statutes or regulations is unavailing. The standing analysis displayed in those cases is fully consistent with the rejection of standing in the electronic surveillance cases. Indeed, the application of the reasoning employed by the non-surveillance cases to this case reinforces the plaintiffs' lack of standing to challenge the FAA. The non-surveillance cases cited by the plaintiffs stand for the proposition that a plaintiff may challenge a specific law or regulation before it is enforced against the plaintiff if the plaintiff is subject to that law or regulation and has a well-founded fear that it will be so enforced. The plaintiffs in this case have made no showing that they are subject to any specific law or regulation that they seek to challenge. The FAA does not require that the plaintiffs do anything or refrain from doing anything such that they might have a well-founded fear that the Government would take action against them for failing to abide by the statute. Moreover, the FAA does not authorize surveillance of the plaintiffs' communications and the plaintiffs have made no showing that the Government has sought any such surveillance pursuant to the general framework set forth in the statute or that such surveillance has been authorized. It is unnecessary to seek to define the outer limits of what it would take for the plaintiffs to be subject to the FAA such that they would have standing to challenge its constitutionality. The plaintiffs' failure to show that they are subject to the FAA in any concrete way is sufficient to conclude that the plaintiffs lack standing to challenge the FAA.

Under the line of non-surveillance cases referred to by the plaintiffs, "[a] plaintiff bringing a pre-enforcement facial challenge against a statute need not demonstrate to a certainty that it will be prosecuted under the statute to show injury, but only that it has an actual and well-founded fear that the law will be enforced against it." *Vt. Right to Life*, 221 F.3d at 382 (internal quotation marks omitted). The plaintiffs seek to couch their fear of surveillance under the FAA as an "actual and well-founded fear" that the FAA will be enforced against them. But the cases are clear that an actual and well-founded fear of enforcement depends upon a reasonable showing that the plaintiff is subject to the challenged law or regulation. In the cases cited by the plaintiffs involving pre-enforcement challenges to non-surveillance statutes, the plaintiffs in those cases were subject to a challenged statute or regulation such that there would be consequences resulting from a failure to comply. Courts reasonably have allowed challenges to such legal proscriptions without requiring the plaintiff to incur the penalties of

non-compliance. *Cf. Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 302–03, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (granting standing for pre-enforcement challenge to certain provisions of statute based on "realistic danger" of enforcement where plaintiffs intended to engage in conduct "arguably prohibited by the statute"); *Pacific Capital Bank, N.A. v. Connecticut,* 542 F.3d 341, 350 (2d Cir. 2008) (finding standing for pre-enforcement challenge by national bank to state statute limiting certain interest rates where plaintiff "reasonably interpreted [the statute's] limitation as, on its face, applying to [the plaintiff]"); *Vt. Right to Life,* 221 F.3d at 383 (finding standing for pre-enforcement challenge to statute proscribing range of activities relating to campaign finance disclosure and reporting requirements where plaintiff's interpretation of proscription to cover its activities was "reasonable," and plaintiff's activities "could easily be construed" to fall within the statute's proscription); *Nitke v. Gonzales,* 413 F.Supp.2d 262, 267 (S.D.N.Y. 2005) (per curiam) ("[T]o show that a fear [of enforcement] is well-founded, the plaintiff must show that it is reasonable. A fear that a statute will be enforced against a plaintiff is reasonable if the plaintiff's interpretation of the statute to reach his or her conduct is itself reasonable.") (internal citation and quotation marks omitted).

Every non-surveillance pre-enforcement challenge case cited by the plaintiffs involved a law or regulation that could, at the very least, reasonably be interpreted on its face to apply to the plaintiffs in that case. The plaintiffs in such cases faced the risks of non-compliance unless they received judicial relief from enforcement of the statute or regulation against them. *See, e.g., Am. Booksellers Ass'n,* 484 U.S. at 392, 108 S.Ct. 636 (granting standing for pre-enforcement challenge to statute where "the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution"); *Am. Booksellers Foundation,* 342 F.3d at 100–01 (finding standing for pre-enforcement challenge to state statute proscribing residents from distributing pornographic material harmful to minors where statute "reach[ed] material posted on plaintiffs' websites"); *New Hampshire Right to Life Political Action Committee v. Gardner,* 99 F.3d 8, 14 (1st Cir.1996) ("The record reveals that [the plaintiff] intends to engage in political expenditures of a type protected under the First Amendment, and New Hampshire's statutory scheme restricts [the plaintiff's] freedom to make those expenditures.") (internal citation omitted); *see also Pac. Capital Bank,* 542 F.3d at 350; *Vt. Right to Life,* 221 F.3d at 383.

The plaintiffs attempt to stretch the pre-enforcement cases to apply to their challenge to the FAA even though those cases do not arise in the context of electronic surveillance or surveillance of any kind, and even though the facts of those cases bear no resemblance to the standing issues raised in the context of the FAA. A fundamental tenet of standing is that a plaintiff must show that the plaintiff has suffered an actual or imminent injury in fact, that is concrete and particularized, and not conjectural or hypothetical. *Lujan,* 504 U.S. at 559, 112 S.Ct. 2130. In each of the pre-enforcement cases, the plaintiff or plaintiffs could point to a specific statute that reasonably could be applied to them and which produced consequences if they failed to comply. That provided concrete and particularized injury.

In this case, the plaintiffs have not made a reasonable showing that they are subject to the challenged statute in any way. The FAA does not require the plaintiffs to do anything or refrain from doing anything, and does not authorize surveillance to

which the plaintiffs will be subject. The statute cannot reasonably be interpreted on its face to apply to the plaintiffs, because it neither authorizes surveillance nor refers to a class of persons that on its face could reasonably be construed to include the plaintiffs. Moreover, there is no allegation or evidence that an order has been obtained pursuant to the statute authorizing the surveillance of communications that could reasonably be construed to include the plaintiffs' communications. Therefore the plaintiffs cannot establish standing on the basis of a well-founded fear of enforcement. The plaintiffs have failed to show that there is anything to enforce, because they have failed to show that they are subject to the statute. The plaintiffs' alleged fears of enforcement arising from the fact that surveillance orders of unknown scope may eventually be issued that may affect them bear no resemblance to the fears of enforcement of specific statutes or regulations that reasonably apply to complaining plaintiffs and that have been found sufficient for purposes of standing.

The Supreme Court's decision in *Babbitt*, relied upon by the plaintiffs, does not suggest otherwise. In *Babbitt*, the plaintiffs, including a farmworkers' union (the "UFW"), challenged, in relevant part, five provisions of a farm labor statute passed in Arizona. *Babbitt*, 442 U.S. at 292–93, 99 S.Ct. 2301. The Court emphasized that "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Id.* at 298, 99 S.Ct. 2301. The Court held that the plaintiffs had standing to challenge three of the five provisions of the statute but not the remaining two. The first challenged provision regulated the election of employee bargaining representatives, specifying certain procedures for such elections. *Id.* at 292–94, 299, 99 S.Ct. 2301. The Court found that the plaintiffs had

standing to challenge that provision, because "the UFW has in the past sought to represent Arizona farmworkers and has asserted in its complaint a desire to organize such workers and to represent them in collective bargaining." *Id.* at 300, 99 S.Ct. 2301.

The second challenged provision limited consumer publicity and violations of the statute were criminally punishable. *Id.* at 301–02, 99 S.Ct. 2301. The Court found that the plaintiffs had standing to challenge that provision because they intended to engage in consumer publicity and erroneous statements would be inevitable. *Id.* at 302, 99 S.Ct. 2301.

The third challenged provision was the criminal penalty provision of the statute, which authorized the imposition of criminal sanctions against any person violating any provision of the statute. *Id.* at 303, 99 S.Ct. 2301. The Court found that the plaintiffs had standing to challenge the criminal penalty provision because they intended to engage in conduct that may be proscribed by the statute. *Id.*

Standing for the plaintiffs in *Babbitt* lends no support to the plaintiffs in this case. In *Babbitt* the Supreme Court found that the plaintiffs had standing to challenge provisions of a statute that could be construed on their face to proscribe or regulate conduct in which the plaintiffs wished to engage. The analysis in *Babbitt* cannot be superimposed onto this case. The plaintiffs in this case have not challenged a statute that regulates or proscribes any conduct by them, as was the case in *Babbitt*, or that otherwise applies to them.

To the extent the decision in *Babbitt* bears on the issue of standing in this case, it is instructive for its rejection of the plaintiffs' bid for standing to challenge one of the remaining provisions of the statute. That provision provided that no employer

was required to furnish certain information to a labor organization to enable that organization to communicate with employees of the employer, members of the labor organization, its supporters, or adherents (the "access provision"). *Id.* at 303–04, 99 S.Ct. 2301. The UFW argued that it would seek access to employers' property to communicate with farmworkers, which the Court conceded it would do. *Id.* at 304, 99 S.Ct. 2301. However, the Court found the challenge to be non-justiciable because the plaintiffs had not yet "assert[ed] an interest in seeking access to particular facilities as well as a palpable basis for believing that access will be refused." *Id.; see also id.* ("[I]t is conjectural to anticipate that access will be denied. More importantly, [plaintiffs'] claim depends inextricably upon the attributes of the situs involved.").

The plaintiffs' challenge to the FAA is similarly non-justiciable. The plaintiffs seek to challenge the FAA without any showing that the FISC has approved surveillance that could encompass their communications. Thus the plaintiffs in this case lack a "palpable basis for believing" that their communications will be surveilled. In *Babbitt* it was "impossible to know whether access will be denied to places fitting [plaintiffs'] constitutional claim." *Id.* The plaintiffs' claim depended upon the attributes of the situs to which they sought access, and the plaintiffs had not asserted an interest in gaining access to any particular situs. Like the plaintiffs in *Babbitt* attempting to challenge the access provision, the plaintiffs in this case have only a hypothetical fear of being harmed by the statute that is insufficient to support standing.[14]

In sum, the plaintiffs' assertion of standing to challenge the FAA on the basis of their fear of surveillance finds no support in the cases that have analyzed standing to challenge electronic surveillance. The plaintiffs' argument also finds no support in the cases relating to drug and alcohol testing or the pre-enforcement challenges to non-surveillance statutes and regulations on which the plaintiffs rely. In none of those contexts do the cases provide any support for the proposition that a plaintiff may challenge a statute to which the plaintiff cannot reasonably be considered subject. On its face the FAA does not regulate or proscribe the plaintiffs' conduct or authorize surveillance of a class of persons that includes the plaintiffs. Moreover, the plaintiffs have neither alleged nor shown that the Government has sought or obtained an order from the FISC authorizing surveillance that could reasonably be construed to encompass their communications. The plaintiffs' alleged fear of surveillance is insufficient to provide them with standing to challenge the FAA.

**B**

■ The plaintiffs purport not to rely solely upon their fear of surveillance as a basis for standing to challenge the FAA. They offer what they characterize as a second, independent basis for standing: the costly and burdensome measures they have undertaken, as a result of that fear, to ensure the confidentiality of their international communications. The plaintiffs argue that such costs constitute "specific present objective harm[s]" suffered as a result of the passage of the FAA and therefore qualify as an injury in fact for purposes of standing. (Tr. 18.) The Government counters that any costs incurred

---

14. In *Babbitt* the Supreme Court also denied the plaintiffs standing to challenge a compulsory arbitration provision in the statute. The Court based its holding in part on the fact that the plaintiffs had "never contested the constitutionality of the arbitration clause." *Id.* at 305, 99 S.Ct. 2301.

by the plaintiffs have resulted not from the challenged statute itself but from the alleged subjective chilling effect the statute has had on the plaintiffs' communications. The Government urges that the assertion of standing on the basis of a "subjective chill" of this kind is foreclosed by Supreme Court precedent.

The costs the plaintiffs have incurred in an effort to protect the confidentiality of their international communications fail to provide a basis for standing to challenge the constitutionality of the FAA. This second basis for standing is not truly independent of the first basis; the costs incurred by the plaintiffs flow directly from the plaintiffs' fear of surveillance. To allow the plaintiffs to bring this action on the basis of such costs would essentially be to accept a repackaged version of the first failed basis for standing. The plaintiffs cannot manufacture a sufficient basis for standing from an insufficient one.

The plaintiffs argue that their fear of surveillance has chilled their normal exchange of international communications and thereby forced them to incur certain costs to protect the confidentiality of those communications by carrying them out through alternative means. But because the plaintiffs have failed to show that they are subject to the FAA and that they face a threat of harm from its enforcement, the chilling of their speech that they attribute to the statute is actually the result of their purely subjective fear of surveillance. The Supreme Court has held that a subjective chill of this kind is insufficient to support standing. In *Laird v. Tatum,* 408 U.S. 1, 6, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), the Supreme Court considered a First Amendment challenge to an Army surveillance program that entailed "the collection of information about public activities that were thought to have at least some potential for civil disorder," and the dissemination and storage of such information within the Army. The plaintiffs argued that they had standing to challenge the program because the existence of the program chilled the exercise of their First Amendment rights. The Court rejected the argument that a plaintiff "who alleges that the exercise of his First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data-gathering activity" has standing to invoke the jurisdiction of a federal court. *Id.* at 10, 92 S.Ct. 2318. Noting that the plaintiffs had failed to connect the existence of the surveillance program to their own speech, the Court held that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; the federal courts established pursuant to Article III of the Constitution do not render advisory opinions." *Id.* at 13–14 & n. 7, 92 S.Ct. 2318 (internal quotation marks omitted). The Court distinguished its prior cases finding standing to challenge Government conduct that allegedly violated the First Amendment by chilling protected speech, explaining that "in each of these cases, the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging." *Id.* at 11, 92 S.Ct. 2318.

Like the plaintiffs in *Laird,* the plaintiffs in this case allege that their communications are chilled by the sheer existence of the challenged policy without connecting the policy to their own speech. Therefore the analysis of the plaintiffs' second purported basis for standing in this case is controlled by *Laird.* In *Laird* "the chilling effect alleged ... was so remote and speculative that there was no justiciable case or controversy and therefore the federal courts lacked jurisdiction under Arti-

cle III of the Constitution." *Davis v. Vill. Park II Realty Co.*, 578 F.2d 461, 463 (2d Cir.1978) (finding standing for First Amendment claim alleging that threat of eviction, manifested in attempt by defendant management company to terminate tenant plaintiff's lease, chilled plaintiff's expressive activity in connection with tenants' association). The same is true in this case, where the plaintiffs have failed to make any showing that they are subject to the FAA.

The plaintiffs insist that the Supreme Court's distinction in *Laird* between the challenged policy in that case and challenged exercises of Government power in previous cases that were "regulatory, proscriptive, or compulsory in nature" was only a distinction and not a prospective rule that plaintiffs may only challenge Government policies that are regulatory, proscriptive, or compulsory. *See Socialist Workers Party v. Attorney General of the United States*, 419 U.S. 1314, 1318, 95 S.Ct. 425, 42 L.Ed.2d 627 (1974) (Marshall, J., sitting as Circuit Justice) ("In my view ... the Court [in *Laird*] was merely distinguishing earlier cases, not setting out a rule for determining whether an action is justiciable or not."); *ACLU*, 493 F.3d at 693 n. 3 (Gibbons, J., concurring) ("The language in *Laird* about regulation, proscription, and compulsion to me seems merely descriptive of the facts in prior cases in which the Supreme Court had found standing."); *but see ACLU*, 493 F.3d at 661 (Batchelder, J.) ("[T]o allege a sufficient injury under the First Amendment, a plaintiff must establish that he or she is regulated, constrained, or compelled directly by the government's actions . . . .").

It is unnecessary to decide whether an argument for standing based on a chill of expressive activity should be limited to cases in which the plaintiff is complaining about a statute or regulation that is "regulatory, proscriptive, or compulsory in na-ture" or whether a plaintiff can allege such a chill based on a statute or regulation to which the plaintiff is otherwise subject. The plaintiffs in this case have failed to show that they are subject to the statute other than by speculation and conjecture, which is insufficient for standing. The plaintiffs in this case have made no showing that they are subject to the statute they seek to challenge, and therefore have made no showing that they face a danger of being harmed as a result of the statute. In the standing context the indirect harm of a chilling effect on speech may only be asserted in conjunction with a danger of direct harm from the challenged statute, because that danger is the source of the chill. *See Laird*, 408 U.S. at 12–13, 92 S.Ct. 2318 ("[G]overnmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights. At the same time, however ... to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action.") (internal quotation marks and ellipsis omitted). As the Supreme Court explained: "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of future harm; the federal courts established pursuant to Article III of the Constitution do not render advisory opinions." *Id.* at 13–14, 92 S.Ct. 2318 (internal quotation marks omitted).

■ A plaintiff's claim that a Government policy chills the plaintiff's expressive activity is not an independent basis to challenge the policy. The alleged chill must be grounded in a threat of harm from the policy to which the plaintiff can reasonably argue he is subject; otherwise the chill is plainly subjective. *Cf. Davis*, 578

F.2d at 463 (chilling effect grounded in threat of eviction). A chilling effect can only be a product of a threat of direct harm, not a "substitute" for such a threat. *Laird,* 408 U.S. at 14, 92 S.Ct. 2318.

The plaintiffs argue that the chilling effect the FAA has had on their speech cannot be considered subjective because they have incurred real, objective costs to avoid surveillance. Embedded in that argument is a misunderstanding of what was meant in *Laird* by the term "subjective." In *Laird* the Supreme Court found that a plaintiff cannot establish standing by "alleg[ing] that the exercise of his First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data-gathering activity ...." *Id.* at 10, 92 S.Ct. 2318. What made the chilling effect subjective in *Laird* was the plaintiffs' failure to show that they were subject to the challenged policy and faced a threat of harm from it. The plaintiffs could only show that the surveillance policy existed. The plaintiffs' failure to substantiate the alleged chill with proof that they really were subject to the information gathering policy made their alleged chill "subjective." *See Ozonoff v. Berzak,* 744 F.2d 224, 229 (1st Cir.1984) (Breyer, J.) (interpreting phrase "without more" in *Laird* to mean that "[t]he plaintiffs in *Laird* did *not* claim that the information gathering activities were directed against them specifically or that the gathered data could be directly used against them in any foreseeable way"). All of the plaintiffs' alleged "objective" expenditures are insufficient to establish standing because they all arise from the plaintiffs' choices to incur expenditures and costs that are not based on a sufficient showing that the statute in question was directed at them.

The Court of Appeals for the District of Columbia Circuit relied upon *Laird* in rejecting the allegation of a chilling effect

as a basis for standing in *United Presbyterian.* The *United Presbyterian* Court denied standing to certain political and religious organizations to challenge an Executive Order that provided a framework for agencies within the intelligence community to seek and obtain approval from the Attorney General for certain kinds of surveillance. One of the bases for standing that was proffered by the plaintiffs and rejected by the Court was the assertion that their expressive activities were chilled by the fear that their communications would be surveilled under the Executive Order. *See United Presbyterian,* 738 F.2d at 1378. In rejecting this basis for standing, the Court explained that "[a]ll of the Supreme Court cases employing the concept of the 'chilling effect' involve situations in which the plaintiff has unquestionably suffered some concrete harm (past or immediately threatened) apart from the 'chill' itself." *Id.* In *United Presbyterian* the plaintiffs could not point to any such concrete harm because they could not show that "any specific action [was] threatened or even contemplated against them" with respect to the Executive Order. *Id.* at 1380.

The same analysis applies in this case. The plaintiffs have not shown that any specific action is threatened or contemplated against them because they have not shown that they are subject to the FAA. Therefore they have failed to allege a concrete harm "apart from" the chilling effect on their international communications, and the chilling effect is their subjective fear of being surveilled which is insufficient in the absence of evidence that they are subject to surveillance under the statute. *Cf. ACLU,* 493 F.3d at 688 (Gibbons, J., concurring) (rejecting assertion of standing based on chilling effect together with assertion of standing based on "well-founded fear" of surveillance because "[t]he disposition of all of the plaintiffs' claims depends

upon the single fact that the plaintiffs have failed to provide evidence that they are personally subject to the [challenged surveillance program].").

The plaintiffs cite a number of cases allowing challenges to statutes or policies based on the chilling effect such statutes or policies had on a plaintiff's expressive conduct. But in each of those cases, the plaintiff was subject to the challenged policy and faced potential harm from the enforcement of the policy. In *Meese v. Keene*, 481 U.S. 465, 467, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987), the plaintiff alleged that he was chilled from exhibiting three films because under the challenged statute they would be labeled "political propaganda," thereby injuring his reputation. Crucially, there was no question in *Meese* that the statute applied to the films the plaintiff wished to exhibit. *See Meese*, 481 U.S. at 467 n. 1, 107 S.Ct. 1862. That fact distinguishes *Meese* from this case. In holding that the plaintiff had standing in *Meese*, the Supreme Court emphasized that the plaintiff had shown that he faced a threat of harm from the statute if he chose to exhibit the films. *See id.* at 473, 107 S.Ct. 1862 ("We find, however, that [the plaintiff] has alleged and demonstrated more than a 'subjective chill'; he establishes that the term 'political propaganda' threatens to cause him cognizable injury."). The Court explained that under *Laird*, if the plaintiff could not show that the label of "political propaganda" would be harmful to him, he would not have standing to challenge the statute. *See id.* The plaintiff plainly could not have shown that the label would be harmful to him without showing that his films would be subject to the label. The finding that the plaintiff's films were subject to the challenged statute was a predicate to the finding of standing in *Meese* for which there is no corollary in this case.

The plaintiffs fare no better in their reliance on *Ozonoff*. In *Ozonoff*, the Court of Appeals for the First Circuit found standing to challenge an Executive Order based on the chilling effect it would exert on the plaintiff's expressive activity. *See Ozonoff*, 744 F.2d at 228. The Executive Order provided for a loyalty check, conducted by the Executive Branch, of persons who applied to work for the World Health Organization (the "WHO"). *See id.* at 225. The plaintiff in *Ozonoff* "would like to work" for the WHO, and thus there was no question that he was subject to the policy of loyalty checks and the potential harm of being denied a job with the WHO on account of being found disloyal if the policy were enforced. *Id.* The Court found standing based on the plaintiff's assertion that he planned to apply for a job with the WHO and the challenged policy chilled his expressive conduct by discouraging activity that might be considered disloyal. *See id.* at 228–29. The Court explained that the relevant inquiry was "whether the Order reasonably leads [the plaintiff] to believe he must *conform* his conduct to its standards." *Id.* at 229–30. In distinguishing the case from *Laird*, the Court made clear that the reasonableness of that belief depended on the plaintiff being subject to the challenged policy: "The plaintiffs in *Laird* did *not* claim that the information gathering activities were directed against them specifically or that the gathered data could be directly used against them in any foreseeable way." *Id.* at 229 (emphasis in original).

The plaintiffs in this case have not shown that the challenged statute is directed against them. The chilling effect in *Ozonoff* was the result of the plaintiff's fear of harm from the enforcement of a policy to which he was subject. Because that much has not been shown in this case, the alleged chill of the plaintiffs' speech in this case is not analogous to the chill of the

plaintiff's speech in *Ozonoff. Cf. also Socialist Workers Party,* 419 U.S. at 1315, 95 S.Ct. 425 (Marshall, J., sitting as Circuit Justice) (granting standing to challenge prospective surveillance of convention where plaintiffs "apparently learned that the FBI planned to monitor the ... convention").

The plaintiffs claim to find support for their assertion of standing based on the chilling of their speech in *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). In *Laidlaw,* the Supreme Court found that environmental groups whose members, among other things, wished to use and enjoy a river into which the defendant was dumping pollutants, had standing to sue the defendant.[15] *See Laidlaw,* 528 U.S. at 181–82, 120 S.Ct. 693. The Court found that the plaintiffs had demonstrated injury in fact based on the evidence that members of the plaintiff environmental groups were deterred from using the river by the defendant's pollution. *See id.* at 183, 120 S.Ct. 693. The plaintiffs suggest that their own reluctance to engage in international communications is analogous to the reluctance of the *Laidlaw* plaintiffs to use the river. They extrapolate from that analogy that they have standing to challenge the FAA.

The plaintiffs' reliance on *Laidlaw* is plainly misplaced. *Laidlaw* did not concern an alleged chill of First Amendment activity, making any comparison between the plaintiffs' second purported basis for standing in this case and the plaintiffs' basis for standing in *Laidlaw* strained at

best. In any event, *Laidlaw* does not help the plaintiffs. In *Laidlaw* the members of the plaintiff organizations had allegedly ceased to use the river because of the concrete harm caused by the defendant's discharge of pollutants into the river. The discharge of pollutants was already occurring and there was no question that the plaintiffs were affected by the discharge because they ceased to use the river as a result of the defendant's activity that allegedly harmed the river in which they had an environmental interest. *Cf. ACLU,* 493 F.3d at 689 (Gibbons, J., concurring) ("[I]n *Laidlaw,* the plaintiff's [sic] *fear of harm* from the defendant's undisputed conduct—conduct that would also undisputably affect plaintiffs personally if they undertook their desired activities—was sufficient to support standing.") (emphasis in original).[16] In this case, the plaintiffs' reluctance to engage in their desired speech is self-imposed because their fear of surveillance under the FAA is an abstract and hypothetical one, for all of the reasons explained above. Thus the reasoning behind the finding of standing in *Laidlaw* does not support the plaintiffs' standing argument in this case.

The plaintiffs' reliance on *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), fares no better. Like *Laidlaw, SCRAP* did not involve an alleged chill of First Amendment activity. Indeed, the analysis of standing in *SCRAP* did not concern any sort of deterrence or discouragement of the plaintiffs' behavior.

*SCRAP* concerned a challenge by environmental groups, among others, to a deci-

---

**15.** The plaintiffs in *Laidlaw* also included a person whose property value was allegedly diminished by the pollution of the river and another who would like to purchase a home near the river but did not intend to do so because of the pollution. *See id.* at 182, 120 S.Ct. 693.

**16.** Judge Gibbons explained: "I read *Laidlaw* to require that plaintiffs demonstrate that they (1) are in fact subject to the defendant's conduct, in the past or future, and (2) have at least a reasonable fear of harm from that conduct." *ACLU,* 493 F.3d at 689 (Gibbons, J., concurring).

sion by the Interstate Commerce Commission (the "Commission") allowing railroads to collect a 2.5% percent surcharge on freight rates. SCRAP, 412 U.S. at 678, 93 S.Ct. 2405. The plaintiff groups argued that the surcharge would harm them by making the use of recycled goods more expensive, thereby impacting forests and other natural environments that members of the plaintiff groups used and intended to use. *See id.* at 684–85, 93 S.Ct. 2405. The Court acknowledged skepticism with respect to whether the plaintiffs would be able to prove that the surcharge would harm the areas of the environment in which the plaintiffs had an interest. *See id.* at 688, 93 S.Ct. 2405 (referring to chain of causation as "attenuated"). Nevertheless, the Court found standing because the plaintiffs' allegations, "if proved, would place them squarely among those persons injured in fact by the Commission's action[.]" *Id.* at 690, 93 S.Ct. 2405. The standing issue in SCRAP arose on a motion to dismiss based on the pleadings, and therefore the Court's doubts as to whether the plaintiffs would be able to prove that the surcharge would cause them harm did not bear on the standing analysis. *See id.* at 683–84, 93 S.Ct. 2405.

It is difficult to understand how the plaintiffs can find any analogy between the standing analysis in SCRAP and their effort to allege standing in this case. In SCRAP, the conduct challenged by the plaintiffs was the Commission's authorization of the railroads to collect a surcharge that the plaintiffs alleged would injure them. The collection of the surcharge had already been authorized and the plaintiffs alleged facts that, if true, would "place them squarely among those persons injured" by the surcharge. The plaintiffs' fear of surveillance under the FAA in this case bears no relation to the plaintiffs' fear of harm from the surcharge in SCRAP. The plaintiffs in this case have neither alleged nor shown that surveillance encom-

passing their communications has been authorized or even that such authorization has been sought by the Government. Neither in SCRAP nor in any case cited by the plaintiffs has any court found that a plaintiff had standing to bring a lawsuit in circumstances remotely similar to these.

For all of the reasons explained above, the plaintiffs' second purported basis for standing cannot survive the failure of the first. Therefore the costs incurred by the plaintiffs in seeking to protect their international communications from surveillance under the FAA do not constitute a basis for standing for the plaintiffs' constitutional challenge to that statute.

CONCLUSION

For all of the foregoing reasons, the plaintiffs lack Article III standing to bring this constitutional challenge to the FAA. The plaintiffs' motion for summary judgment is **denied.** Government's motion for summary judgment is **granted.** The Clerk is directed to close Docket Nos. 6 and 12 and to enter judgment dismissing the complaint and closing this case.

**SO ORDERED.**